Bandel *vs.* Isaac.

(Decided March 17th, 1859.)

---

# Philip Bandel *vs.* James W. Isaac.

The 49th section of the 3rd article of the Constitution says: "The rate of
interest in this State, shall not exceed six per cent. per annum, and no
higher rate shall be taken or demanded, and the Legislature shall pro-
vide, by law, all necessary forfeitures and penalties against usury."
Held:

1st. That this section does not, *of itself*, make void, in whole, a contract
demanding or exacting more than six per cent. interest; it merely fixes
the legal rate of interest.

2nd. That it is for the Legislature, by forfeitures and penalties, to make
the contract void, either in whole or in part, as to it may seem best, and
by penalties punish the party or parties, making such a contract.

3rd. That until the Legislature shall, by law, provide the necessary for-
feitures and penalties, the act of 1845, ch. 352, remains in force.

4th. That this act relates only to the *remedy;* that is, it prescribes the
*mode*, in which a party seeking to avoid any part of a contract on the
ground of usury, shall bring such defence to the notice of the court.
Until he does bring such defence to the notice of the court, in legal con-
templation it has no existence.

In construing a constitution, the courts must consider the circumstances.
attending its adoption, and what appears to have been the understanding

Bandel vs. Isaac.

of those who adopted it, keeping in view the proper office of such an instrument, which is to declare general rules and principles, and to leave to the Legislature the duty of preserving or enforcing them, by appropriate regulations and penalties.

The words in a constitution ought to be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers, and by the people who adopted it.

If the people of the State, and their courts had regarded the statutes on the subject of usury as importing a certain thing, whenever the same or equivalent words are employed in a subsequent constitution or statute, the presumption of law is, that they are used in the same sense.

APPEAL from the Court of Common Pleas.

*Assumpsit*, brought on the 5th of January 1856, by the appellee, the holder, against the appellant, the maker of a promissory note for $250, dated the 8th of May 1855, payable at seven months, to the order of Michael H. Bandel, and by him endorsed. Plea, *non-assumpsit*, upon which issue was joined.

*Exception:* At the trial the plaintiff proved the making and endorsement of the note, and the defence relied upon was that of *usury*. The proof on the part of the defendant, is sufficiently indicated by the following instructions, which he prayed the court to give to the jury.

1st. If the jury shall believe from the evidence, that the note sued on in this case, was made and delivered to the plaintiff by the defendant, and at the time of doing so, more than the rate of six per centum per annum, was demanded, and paid on the amount of said note for the time it had to run, the plaintiff is not entitled to recover.

2nd. If the jury shall believe from the evidence, that the note sued on in this case, was endorsed by Michael H. Bandel, for the accommodation of the defendant, and without consideration or value given by the said endorser, and the same was used by the defendant, to take up and renew a usurious note held by the plaintiff against the defendant for the same sum, and was delivered by the defendant to the plaintiff, upon taking up and renewing such usurious note and at the time of such transaction, besides the note sued on in this case, the defendant agreed to pay for such renewal in money, at the rate

Bandel *vs.* Isaac.

of one per cent. per month, on the amount of said note, for the time it had to run, and actually paid such sum, and the plaintiff thereby became the first holder of said note for value, then the said note was usurious and void, and the plaintiff cannot recover.

3rd. If the jury shall believe from the evidence, that the note sued on in this case, was given as a renewal of an accommodation note for the same sum, drawn by the defendant, dated the 20th of November 1854, which was first negotiated by the plaintiff at the sum of $207.50, and that at the time of said renewal, the note sued on was first negotiated and passed by the defendant to the plaintiff, in consideration of the said first note, and that the plaintiff at the time of the renewal demanded and received from the defendant, in consideration thereof, in addition to the note, the sum of $30, the plaintiff can only recover the sum of $207.50, with legal interest from the 20th of November 1854, after allowing a credit of the sum paid in money at the time of the renewal.

These instructions and each of them, the court (MARSHALL, J.) refused to give, and to this ruling the defendant excepted. The verdict and judgment were in favor of the plaintiff, for the full amount of the note, with interest and costs, and the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*Jervis Spencer* for the appellant:

This case involves the question, as to the validity of a contract in this State tainted with usury, and whether such a contract can be enforced in the courts of the State? It was decided in the Court of Common Pleas, that the courts would not only enforce the contract, but that the plaintiff suing on such a contract, could recover not only the amount of consideration paid in the contract, but the excess too which constituted the usury. It is insisted for the appellant, that the court was wrong upon both propositions.

The 49th section of the 3rd article of the constitution de-

Bandel *vs.* Isaac.

clares; that "the rate of interest in this State, shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded, and the Legislature shall provide, by law, all necessary forfeitures and penalties against usury," and it is upon the true construction and effect of this clause in the organic law of the State, that the question arising in the present case must be decided.

By the 3rd article of the Bill of Rights, "All acts of Assembly, in force on the first Monday of November, eighteen hundred and fifty, except such as may have since expired, *or may be altered by this constitution,*" are continued in force. By this it will be seen, that the constitution does not undertake to repeal any law by *special reference,* but declares all laws *inconsistent* with its provisions void. The act of 1845, ch. 352, cannot be a subsisting act, since the adoption of the constitution, for a simple comparison of this act with the clause of the constitution now in question, will show the law to be *inconsistent* with it. The latter, in plain, positive and direct terms, says, that "no higher rate than six per cent. interest, *shall* be taken or demanded," while the former says, that more than six per cent. interest may be taken, demanded and recovered, unless the party chooses specially to plead the usury, and he can only do that upon the condition, that he pays the sum actually loaned with legal interest. The act of 1845, virtually repeals the law of 1704, and leaves the *morals* of the law of usury, to each individual who may happen to have a case involving the question, whereas the constitution comes in and says, there shall be a paramount policy which shall govern *all cases,* and further provides, that the Legislature shall pass laws imposing *penalties* upon usury. It clearly denounces the usury, and all that it leaves to the Legislature to do, is the imposing of forfeitures and penalties therefor. No more than six per cent. shall be taken or demanded, and this prohibition is the same, as if the constitution had said, no money shall be recovered upon any contract in consideration of illicit intercourse or any other immoral act, or crime, and that the Legislature should impose penalties therefor. It is not necessary that a penalty should be imposed, in order to avoid the contract, for

if the Legislature should impose such penalty, the contract would only be void by *construction*, and the imposition of such a penalty could have no more effect in avoiding the contract, than the declared policy of the constitution. This provision in relation to usury, is the same as that in the 5th section of the 3rd article, in reference to lotteries, which declares, that "from and after the first day of April, eighteen hundred and fifty-nine, no lottery scheme shall be drawn, for any purpose whatever, nor shall any lottery ticket be sold in this State."

But this very provision has been construed by Chief Justice Taney, in the case of *Dill vs. Ellicott*, in the Circuit Court of the United States, and that eminent jurist was clearly of opinion, that this clause of the constitution does, of itself, avoid the contract, and upon the reasoning and authority of that opinion, this argument may well be rested. It is there decided, that though the constitution does not say in express terms, that the contract shall be void, yet that a contract to do an act *forbidden by law*, is void, and cannot be enforced in a court of justice; that courts are instituted to carry into effect the laws of a country, and they cannot become auxiliary to the consummation of a violation of law; that no court of justice can, in its nature, be made the handmaid of iniquity.

In the case of *Territt, et al., vs. Bartlett*, 21 *Verm.*, 184, it was held, under the statute of Vermont, which prohibited the sale of spirituous liquors in that State, except under license to sell for certain specified purposes, that parties in New York, who had sold liquors to a person residing in Vermont, knowing that the latter intended to sell them without license, and in violation of this law, could not sustain an action in the courts of Vermont, to recover therefor, and the decision is placed upon the ground, that a contract which has for its object, or which contemplates any act *prohibited* by express statute, or the commission of which incurs a penalty, is as much illegal and void, as if the statute in express terms so declared. In the case of *Bancroft vs. Dumas*, 21 *Verm.*, 456, it was held, under another statute of that State, which imposed a penalty for the sale of spirituous liquors without a license, that the *contract* of sale was an illegal one, which a court of justice will never

Bandel vs. Isaac.

lend its aid to enforce, and it is there said, that it has long been settled law, that a promise made in consideration of an act which is forbidden by law, is void.

By a statute of Massachusetts, the sale of shingles except of certain quality and size was prohibited under a penalty, and in the case of *Wheler vs. Russell*, 17 *Mass.*, 258, it was held, that no action would lie upon a promissory note, the consideration whereof, was a sale of shingles not of the size prescribed by the statute, and Chief Justice Parker, delivering the opinion of the court said, that no principle of law is better settled, than that no action will lie upon a contract made in violation of a statute, or of a principle of the common law. In *Bayley vs. Taber*, 5 *Mass.*, 293, which was the case of the issual of certain promissory notes made void by statute, and the maker of the notes set up the defence against an innocent holder, it was said by the court, that it is no novel doctrine, that a person shall be permitted to avoid his contract by alleging his own criminality, provided it consists in the violation of some positive statute; that *contracts*, the consideration of which is money won at play, or loaned at *unlawful interest*, have always been subject to the same rule, not only against those who participated in the offence, but even against innocent endorsers, when they have claimed the performance of such contracts.

By statutes of New York, relating to turnpike and plank road companies, it was declared, that no director of the corporation "to which he shall belong, shall be concerned directly or indirectly in any contract, for the making or working of the road, or any part thereof, during the time he shall be a director," and in the case of *Barton vs. Port Jackson & Union Falls Plank Road Co.*, 17 *Barb.*, 397, the company had made a contract for the construction of part of the road, with two of its directors who brought suit thereon against the company, but the court said: "'The contract was expressly within the prohibition of the statute, and the question is, whether it is not therefore *void?* The statute is only prohibitory in its terms. It does not *declare, in so many words*, that all such *contracts shall be void.* But this is not necessary. Every act done against a prohibitory statute is not only illegal but *absolutely*

*void*, and the court cannot assist an illegal transaction in any respect, or permit it to be set up as a protection."

In the case of *Mitchell vs. Smith*, 1 *Binney*, 117, a suit was brought upon a sealed bill, the consideration of which was the sale of lands in Pennsylvania, under the Connecticut title, contrary to the statute of that State, which prohibited such sales, and imposed a penalty therefor, and the court held the contract void, and say: "All that is contended for is, that the contract is illegal, being founded on a breach of the law, and of consequence a void contract, and cannot be enforced in a court of law. And for this purpose, there cannot be a more express authority than the one in *Carthew*, 252, where *Lord Chief Justice Holt*, says, 'that every *contract* made by or about a matter or thing which is prohibited, and made unlawful by any statute, is a *void* contract, though the statute itself doth not mention that it shall be so, but only inflicts a penalty on the offender; because a penalty implies a *prohibition*, though there are no prohibitory words in the statute.' This authority, although perhaps it might not warrant a conclusion, that a penalty implies a prohibition, for the purpose of making the offence punishable by indictment, in case the law had prescribed another and a specific punishment for the offence, yet it certainly is an authority, to prove that a *contract* about a matter prohibited by statute is unlawful, and a void contract, although the act does not expressly say so, *and* that a penalty implies a prohibition, so as to make the contract void."

In the case of *Sharp vs. Teese*, 4 *Halsted*, 352, it was held, that a note given by an insolvent debtor to two of his creditors, in consideration of their withdrawing their opposition to his discharge, under the insolvent laws of New Jersey, was void as being against the *policy* of those laws, and that an attempt to contravene the policy of a public statute is illegal, though the statute contains no express prohibition of such an attempt.

In *Wooten vs. Miller*, 7 *Smedes. & Mar.*, 385, it was held, that a note given for the price of a slave introduced into Mississippi, as merchandise, since the statute of that State pro-

hibiting such importation, is void, because contrary to law, and no recovery can be had on it, upon the principle, that a contract in violation of law, or against public policy, cannot be enforced in the courts of the country, and the same principle was sanctioned in *Odineal vs. Barry*, 24 *Miss.*, 23. The Supreme Court of Tennessee, in *Hale vs. Henderson*, 4 *Humph.*, 200, held, that no principle of law is better settled, than that no action will lie to enforce a contract made in violation of a statute, or of the common law, or which is immoral in its character, and against public policy, and the contract there condemned, was one by which a party agreed not to bid for lands belonging to the State, and exposed to public sale by statute, and to use his influence to prevent others from bidding. Our own Court of Appeals, in *Merrick vs. Bank of Metropolis*, 8 *Gill*, 72, have said, that "a contract illegal in itself, or that contemplates the violation of some statute, or is against public morals, cannot invoke the aid of a court of justice; for the court will not contribute the means of infringing the law." See, also, on this question, 4 *Wash. C. C. Rep.*, 299, *Toler vs. Armstrong; Byles on Bills*, 236; 22 *Viner's Abr.*, 292, and 2 *Rolle's Rep.*, 469, *Oliver vs. Oliver*, (in which last two authorities it was held, that a contract tainted with usury was *void at common law,*) and also the cases cited in the opinion of Chief Justice Taney, in *Dill vs. Ellicott.*

These authorities, I think, clearly establish, that the clause of the constitution now under consideration, prohibiting as it does, the taking or demanding of more than six per cent. interest, renders the note upon which this suit was brought void, and that the act of 1845 is no longer in existence. The only remaining question then is, can this defence be availed of under the *general issue*, or must it be specially pleaded? Upon this question there can be no difficulty, for it is clear, that an inhibition of this kind, in a fundamental law, need not be pleaded, and that usury may be given in evidence as a defence under the general issue. 1 *Chitty's Pl.*, 477. 2 *H. & G.*, 134, *Osgood vs. Spencer.* 1 *Strange.*, 498, *Bernard vs. Saul.* 3 *Cranch.*, 180, *Levy vs. Gadsby.*

27    v. 13.

Bandel *vs.* Isaac.

*Thos. G. Pratt* and *Thos. S. Alexander* for the appellee: (An argument of *Mr. Alexander,* is also inserted in the appendix to this volume.)

The first and second prayers of the defendant, affirm substantially, that the plaintiff cannot recover *at all,* because of the usury, and the third affirms, that under *the issue of non-assumpsit alone,* the plaintiff can only recover the principal sum advanced by him on the note, with legal interest thereon.

By the laws of the State, as they stood at the time of the adoption of the present constitution, it is clear, that the decision of the court below, rejecting the first and second prayers was right, (act of 1845, ch. 352. 9 *Gill,* 143, 145, *Gwynn vs. Lee,)* and the only question in this case is, as to the effect of the 29th section of the 3rd article of that constitution, which enacts: "That the rate of interest in this State, shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded, and the Legislature shall provide, by law, all necessary forfeitures and penalties against usury."

On the part of the appellant the proposition is and must be, that this constitutional provision, *per se,* annuls all contracts or securities made, or originating under an usurious agreement, and repeals all the anterior legislation of the State, since the act of 1704, protecting *bona fide* holders, without notice of the usury, or imposing upon the borrower the obligation to pay the principal sum really advanced, with legal interest.

On the part of the appellee it is insisted, that the whole purpose of this constitutional provision is, to fix the rate of interest, and determine what shall be usury in this State, by constitutional regulation put beyond the reach of legislation, and to leave to the Legislature the determination of all the consequences of the commission of usury, of *all* the forfeitures or losses of right, and *all* the penalties to be incurred thereby, including the annulment of the contract or security, which, if made a consequence of usury, is a forfeiture and penalty also; that it was not intended to abrogate the antecedent and then existing legislation of the State, as to the consequences of, or forfeitures and penalties for usury, but on the contrary, to preserve them, subject to the future power of the Legislature to

Bandel *vs.* Isaac.

alter or amend them; and that even if it were conceded, that this constitutional provision operates as an implied repeal of all such anterior and then existing legislation, as to the consequences of usury, yet, as this provision itself declares none of the consequences of the usury, inflicts no forfeitures or penalties, and is merely *mandatory* to the Legislature, as to all the necessary forfeitures and penalties against usury, and there has been no legislation under that power and mandate, the security is not void.

In *construing* this constitutional provision, we insist upon the following rules of construction.

1st. That the constitution as an instrument framed for, and adopted by the people, is to be construed according to the understanding of its provisions by the people, and their intent in the adoption of them, so far as these can be ascertained either by the terms used, or by extrinsic aids to the ascertainment of that understanding and intent, and having reference to the proper office of a constitution, which is to declare general rules or principles, and to leave to the Legislature the duty of preserving or enforcing them by appropriate regulations, sanctions and penalties; and that the words used in such an instrument must be taken in their ordinary and common acceptation, because they are presumed to have been so understood, by the framers and by the people who adopted it. 5 *Md. Rep.*, 351, *State vs. Mace.* 7 *Md. Rep.*, 147, *Manly vs. The State.* 15 *Pet.*, 492 to 503, *Groves vs. Slaughter.*

2nd. That in construing it, it is always to be presumed, that its framers and the people knew the prior and then existing legislation of the State, and its judicial or well understood universally received construction. That, therefore, when, in any of its provisions, it adopts the very same enactments, or substantially the same enactments as are contained in a prior statute or statutes on the same subject, it is presumed also to adopt the decided, or understood and generally received construction of such prior statutes; and that when, in any of its provisions, there is not only a presumed but manifestly an intended reference to a prior statute on the same subject, and an adoption only of a part of the enactment of that statute, cou-

pled with a power to the Legislature broad enough, according to the ordinary acceptation of the terms giving that power, to embrace the objects or subjects of the omitted enactments, the presumption is, that by such adoption of part, and such power to the Legislature as to the residue, it was intended to leave all the objects or subjects covered by the omitted enactments, to the action of the Legislature. 3 *Gray*, 450, *Commonwealth vs. Hartnett*. 26 *Ala.*, 32, *Durasmus vs. Harrison*. 32 *Eng. Law & Eq. Rep.*, 85, *Ruckmaboye vs. Mottichund*.

3rd. That by the express provisions of the constitution itself, a citizen of the State is declared to be entitled to the benefit of all laws then in force, unless altered by the constitution, or until affected by future legislation, *(Bill of Rights, art.* 3,) and nothing but a clear and manifest intent by the constitution, to alter or abrogate such prior legislation, can deprive the citizen of his constitutional right to the benefit of such laws; that whenever, therefore, it is insisted, that the citizen has lost his constitutional right to the benefit of any such prior and then existing laws, by a mere *implied* alteration or repeal of them, flowing from other parts of the constitution, the question of such implied alteration or repeal, is *a fortiori*, to be governed by the well settled rules, as to such implied repeals, which are, that in construction they are never favored, that they are never held to exist, if by any reasonable interpretation, the supposed conflicting enactments can be made to stand together, and that in ascertaining whether any such implied repeal was intended, and especially by a constitutional provision, it is proper to look to the object and policy of the prior legislation, alleged to be thus repealed, and the consequences of its overthrow, and to be satisfied in view of these, that by the adoption of the alleged repealing constitutional provision, as understood by the people adopting it, they intended to overthrow such prior legislation and policy. 4 *G. & J.*, 152, *Ches. & Ohio Canal Co. vs. Railroad Co.* 11 *Grattan*, 220, *Parramore vs. Taylor*.

In applying these rules of construction, it is insisted: 1st. That even if it were conceded, that this clause of the constitution did impliedly prohibit or render unlawful, not only the

taking of usurious interest, but also the mere contract or agree-
ment to take it, it did not thereby annul the contract; and 2nd,
That according to the true construction, it was intended to do
no more than fix the rate of interest, define what should be
usury, and prohibit the taking or recovery of the excessive in-
terest.    These views we shall consider in their order.

The first view proceeds upon the hypothesis, that by the
enactment, that "no higher rate than six per cent. shall be
taken or demanded," the contract or agreement to take more,
or the contract or security on which it is taken, is thereby im-
pliedly prohibited and rendered unlawful, and even under this
hypothesis it is insisted:

1st. That even if the contract was thereby prohibited and
made unlawful, it was not thereby necessarily annulled or
made void, but the question, whether it was the purpose of
the constitution, by the force of its own prohibition merely, to
render the prohibited contract wholly void, or only to subject
it to such forfeitures and penalties, (including the total or par-
tial loss of his rights under the contract,) as the Legislature
might have declared, or deem it proper to declare, is a ques-
tion of intention, in the adoption of it by the people, to be
collected from the whole scope of the provision itself, consid-
ered in connection with the anterior and then existing laws on
that subject.    12 *How.*, 80 to 84, *Harris vs. Runnels.*

2nd. That this provision is the same, or substantially the
same, as the enactment of the 1st section of the act of 1704,
ch. 69, by the 2nd and 3rd sections of which, the usurious
contracts and securities are declared void, and the penalties
against usury prescribed; that by the well settled rule of con-
struction applicable to all statutes, the 1st section of this act
did not accomplish what was accomplished by the 2nd section,
viz.; the avoiding of the contract or security, because the en-
actments of the 2nd section, are not to be regarded as mere
surplussage, but on the contrary, as designed to effect what the
1st section had not effected; that the 2nd and 3rd sections of
this act are manifestly intended to declare the forfeitures and
penalties for the usury, and, as a part of those forfeitures, the
loss of all rights under the contract by declaring it void.    And

that, therefore, under the second rule of interpretation before stated, the constitution by the adoption only of the enactments of the 1st section, and the power to the Legislature to make provision for all necessary forfeitures and penalties, covering all the objects of the 2nd and 3rd sections, did not intend to avoid the contract or security, but to leave that, as well as all other forfeitures and penalties, for legislative regulation.

3rd. That the proposition, that this constitutional provision, *per se*, avoids the contract or security, is necessarily an affirmance of the additional proposition, that it also operates a repeal of the acts of 1824, ch. 200, 1845, ch. 352, and perhaps, also of that of 1847, ch. 255, as a complete overthrow of the wise and just policy of those acts, as to the consequences of usury, and a restoration of the rigorous provisions of the 2nd section of the old act of 1704, which have again and again fallen under the condemnation of our courts as going beyond the mischief, and promotive only of injustice and fraud, and were swept away by the Legislature, in deference to the universal sentiment of society. By these acts of 1824, 1845 and 1847, the forfeiture of the contract or security, is so limited as to protect innocent parties, and to give to the borrower, both at law and in equity, only that relief to which he is honestly entitled. The innocent holder without notice of the usury, is, by them, entirely protected. In every case where the defence of usury is available, the borrower is required to pay what is honestly due from him, the principal and legal interest. The policy established by these acts has been by our courts every where, as well as by our legislation, declared to be one corrective of fraud and injustice, and entitled in the courts, to the construction of highly remedial acts, and it is insisted, that it never was the purpose of the people, by the adoption of this clause of the constitution, to repeal this legislation, to abandon the settled and progressive policy, which the legislation of our people, and the decisions of our courts, down to the moment of the adoption of the constitution, had established and sustained, as necessary to correct fraud and injustice, and by a retrogade policy, unheard of in the history of a people, to return to a system here, and it might be added throughout the land, long since repudiated as one productive

Baudel vs. Isaac.

of fraud and injustice. It is also insisted, that even if this clause, as adopted, contemplated new regulations on that subject, instead of those of the prior acts, its purpose was to leave them for the determination of the legislature.

Our second view is, that this clause of the constitution, according to its true construction, was only intended to fix the rate of interest and define usury, leaving all the consequences of its commission to the regulation of the Legislature; that, in any view, its only prohibition is against the demand or receipt of the excessive interest, and that alone is rendered unlawful by it; and that such prohibition was not intended to, and does not, *per se*, render the whole contract unlawful and void, and especially not as to the principal and legal interest; and in support of this view it is insisted:

1st. That this is the obvious, ordinary, common sense acceptation of this prohibition, against taking or demanding more than six per cent., and *a fortiori*, when coupled with the further provision, referring the whole subject of the forfeitures and penalties against usury, to the regulation of the Legislature; and that this, therefore, is the sense in which it must be presumed to have been understood and received by the people when they adopted it, according to the first rule of interpretation before stated.

2nd. That this is the proper construction, because by it the whole evil at which the prohibition aims—the excessive interest—is corrected, whilst the contrary construction, going beyond the mischief, injures the innocent, and enables the borrower to practice injustice and fraud, by absolving him from his conceded moral obligation to pay what is justly due from him; because, by it the constitution is thus in consonance with the legislation, and settled policy of the State, on this subject, as it existed at the adoption of the constitution, and had long existed, as one introduced in part by equity, and extended by law, in accordance with the universal sentiment of the people, to prevent fraud and injustice; and by it any implied repeal of such legislation, which is never to be favored, but to be avoided if by any reasonable construction it can be, is thus avoided; whilst the contrary construction, not only renders necessary

Bandel *vs.* Isaac.

such implied repeal, but also imputes to the people, in their adoption of this clause, an intent at war with the fixed and progressive policy of the State, for nearly half a century, and a return to a system long since repudiated by them, as one productive of fraud and injustice.

3rd. That construing this clause, not merely by the rules applicable to the construction of the constitution, as the act of the people, but also by those which apply to statutes, passed in the ordinary course of legislation, the thing prohibited being the "taking or demanding more than six per cent.," this prohibition does not also, *per se*, include a prohibition against taking or demanding the principal or the legal interest, or render this also unlawful; that whatever might be the effect of such a prohibition, standing alone, on the whole contract, yet upon the well settled rules in the construction of statutes, which give meaning and effect to every part, and permit none to be rejected as mere surplussage, and which, for this purpose, will even restrict the meaning or effect of general words or regulations, so as not to embrace that which is, in the same statute, specifically mentioned and regulated, wherever such a prohibition as this is coupled with other enactments, which specifically determine and regulate the effect of the usury upon the contract itself, these specific regulations must alone determine that effect; that, therefore, under our act of 1704, ch. 69, as well as under the English statute of Anne, the nullity of the contract itself, wherever it is annulled, under these statutes, is accomplished, not by force of the prohibition against taking or demanding more than the fixed rate of interest, but by the subsequent and distinct enactment, declaring the contract or security void; that, therefore, wherever in the subsequent legislation of the same, or even of another State, there is a manifest reference to, and adoption of, the prohibition of these acts, it is to receive the same construction as in these acts, and if adopted as the prohibition only, omitting that part of their enactments which declares the nullity of the contract, it is to be presumed, that no such consequence was intended by the adoption of the prohibition merely; that even if this were not so as to ordinary legislation, yet, that under our con-

stitution adopted by the people, with the knowledge, or presumed knowledge, of the enactments of the act of 1704, and of its modifications by the acts of 1824, ch. 200, 1845, ch. 352, and 1847, ch. 255, its prohibition, which is evidently an adoption of the 1st section of the act of 1704, with a reference to the Legislature, for the determination of all the forfeitures and penalties, to be consequent upon its violation, was manifestly intended to leave, for legislative regulation, all that was regulated by the 2nd and 3rd sections of the act of 1704, including the effect of usury upon the whole contract.

As authorities supporting these positions, in addition to those already cited, we refer to 1 *H. & G.*, 477, 484, *Sauerwein vs. Brunner;* 9 *Gill,* 307, *Baugher vs. Nelson;* 6 *G. & J.,* 24, *Trunbo vs. Blizzard;* 7 *Gill,* 173, *Carter & Wife, vs. Dennison;* 10 *Md. Rep.,* 279, *Scaggs vs. Rail Road Co.;* and 1 *Md. Ch. Dec.,* 69, *Wilson vs. Hardesty,* as showing the construction placed by our courts upon these usury laws, and their policy, and in what light they have uniformly regarded the defence of usury; and to 1 *Annual Rep.,* 265, *Reid vs. Duncan;* 2 *Annual Rep.,* 363, *Hynes vs. Cobb;* 2 *Dallas,* 92, *Wycoff vs. Longhead;* 12 *Sergt. & Rawle.,* 46, *Turner vs. Calvert;* 7 *Ohio,* 81, *Lafayette Society vs. Lewis;* 8 *Ohio,* 271, *Bank of Chillicothe vs. Swain;* 3 *McLean,* 604, *McLean vs. Lafayette Bank;* 8 *Wheat.,* 354, *Fleckner vs. United States Bank;* 10 *Wheat.,* 392, *De Wolf vs. Johnson,* and 9 *Pet.,* 398, *United States Bank vs. Waggener,* as showing that this provision in the constitution does not, *per se,* render the *contract void,* and in reference to them it may be remarked, that the case in 9 *Pet.,* is, in our view of it, explanatory of, and expressly overrules the case of *Bank of United States vs. Owens,* 2 *Pet.,* 527, relied on in the opinion of Chief Justice Taney, in *Dill vs. Ellicott,* and re-affirms the doctrine announced in the case of *Fleckner vs. United States Bank,* 8 *Wheat.,* 354, by Justice Story, who there says: "The statutes of usury of the States, as well as of England, contain an express provision, that usurious contracts shall be utterly void; and *without such an enactment the contract would be valid, at least in respect of persons who were*

28      v. 13.

*strangers to the usury.*   The taking of interest by the bank, beyond the sum authorized by the charter, would doubtless be a violation of its charter, for which a remedy might be applied by the government; *but as the act of Congress does not declare, that it shall avoid the contract, it is not perceived how the original defendant could avail himself of this ground to defeat a recovery.*"   We also refer to the following authorities, to support these and the other positions of this argument.   2 *Taunt.,* 184, *Barnes vs. Hedley.   Dwarris on Statutes,* 706, 707, 743.   *Comyn on Usury,* in 5 *Law Lib.,* 673.   2 *Douglas,* 735, *Lowe vs. Waller.*   1 *Pet.,* 37, *Gaither vs. Farmers & Mechanics Bank of Georgetown.*

If these positions are sound, then the act of 1845, ch. 352, is in force, and the court below was right in refusing to grant the defendant's third prayer, because the defence could only be availed of by a special plea.

LE GRAND, C. J., delivered the opinion of this court.

This was an action instituted in the Court of Common Pleas of Baltimore city, by Isaac, the holder, against Bandel, the drawer, of a promissory note, to recover its amount.

At the trial below there was full and unquestioned proof of the making and endorsement of the note.   Under the plea of *non assumpsit* the defence relied upon was that of usury, *and none other.*   To that objection we address ourselves, and, as this is a matter which concerns the daily transactions and dealings of men, we will be as plain and brief as the nature of the inquiry will allow.

If the defence in this case be at all available, it must be because of the language of the Constitution.   In the 49th section of the 3rd article of the Constitution is the following:

"The rate of interest in this State shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded, and the Legislature shall provide, by law, all necessary forfeitures and penalties against usury."

Were it not for an opinion pronounced by the judges of the Circuit Court of the United States, for the district of Maryland, in the case of *Dill vs. Ellicott,* we would experience but little,

if any difficulty, in determining the true import of the consti-stitutional provision. Our high respect for the judgment of the learned judges who gave that opinion, has called upon us to weigh most carefully the reasons given in its support, and to review with the strictest scrutiny our own opinions in re-gard to the matter. The more we have reflected on the sub-ject, the more thorough has been our conviction, that the rule laid down in *Dill vs. Ellicott* ought not to be accepted in this State, as the proper interpretation of the Constitution in this particular.

The theory, on which rests the decision to which we have adverted, is simply this: that the taking of more than six per cent. interest, for the use of money, is usury, and therefore prohibited by law, and, as a consequence, any contract which reserves or authorizes the taking of more than six per cent. is *wholly* void, and, on grounds of public policy, incapable of being enforced by our courts. To this general proposition, to our minds, there are substantial and unanswerable objections. The effect of the decision of that court is, that a contract pro-viding for the payment of more than six per cent. is not sim-ply void as to the *excess*, but void *entirely*. The only author-ity adduced in support of this view is, the case of the *Bank of the United States vs. Owens*, 2 *Peters*, 527. In that case, by a bare majority of the court, it was held, that under the char-ter of the bank a contract, by which more than six per cent. was to be paid, could not be enforced, and that although such contracts were not, *in words*, by the charter, pronounced void, yet the policy of the law made them so in fact, and worked a forfeiture of the money loaned. In that case it was also held, that *"reserving"* was the equivalent to *"taking."* When the same case again appeared before the same court, this was declared to be error, and the distinction between the two clearly pointed out in the opinion of Justice Story. The "re-servation," says he, "of usurious interest makes the contract utterly void; but if usurious interest be not stipulated for, but only taken afterwards, then the contract is not void, but the party is only liable to the penalty for the excess." 9 *Peters*, 399. This decision also established, that the transaction which

had been formerly declared to be usurious and void was free from all taint; and whilst the court does not, in terms, overrule the doctrines of the decision in 2 *Peters,* yet, in explanation of them, places it upon the ground that the case came before the court on a demurrer which admitted the transaction to have been "unlawfully, usuriously and corruptly entered into." With this notice of it, the court then declare, that they "*delibe-* *rately adhere*" to the doctrine of *Fleckner vs. The Bank of the United States,* 8 *Wheaton,* 354. In that case it is said: "The statutes of usury of the States, as well as of England, contain an *express provision,* that usurious contracts shall be utterly void; and without such an enactment the contract would be valid, at least in respect to persons who were strangers to the usury." Now this language was held as applicable to a clause in the charter of the bank, which declared: "That the bank shall not be at liberty to purchase any public debt whatsoever, nor shall it take more than at the rate of six per centum per annum, for, or on its loans or dividends." It is this clause in the charter which the court examined in the case in 2 *Peters,* and on the interpretation of its import there given, the case of *Dill vs. Ellicott* was decided by the Circuit Court for the district of Maryland. If the decision of *Fleckner vs. The Bank of the United States* is, as was said in 9 *Peters,* to be adhered to, it follows, the interpretation given in 2 *Peters* cannot be maintained, for it is in direct conflict with it. Whatever, therefore, might have been the force, as authority, of the case in 2 *Peters,* it has ceased since the decision in 9 *Peters,* where it is *substantially* overruled, and its *opposite,* the doctrine of 8 *Wheaton,* set up, and which, we think, is conclusive of this case, it being, in our judgment, in conformity with the decisions of most of the different States, and in conformity with good reason. The court say: "The taking of interest by the bank, beyond the sum authorized by the charter, would doubtless be a violation of its charter, for which a remedy might be applied by the government, *but as the act of Congress does not declare that it shall avoid the contract, it is not perceived how the original defendant could avail himself of this ground to defeat a recovery.*"

If this be sound law, and we shall presently proceed to show that it is, why should a different interpretation be given to the 49th section of the 3rd article of the Constitution of Maryland? It *"does not declare,"* that a contract exacting more than six per cent. shall be void, any more than did the clause in the bank charter. So far from it, it is plain to us from the very words of the section, that its purpose was, first, to fix and establish a certain legal rate of interest; second, to leave it with the Legislature to provide, "by law," what amount and kind of forfeiture and penalty should be suffered by, and imposed upon, those who should take or demand more than six per cent.

The thing *forbidden* by the Constitution, is the taking or demanding a *higher* rate of interest than six per cent.; it is not forbidden to take or demand that or a lesser rate. The thing forbidden is the *excess* and nothing else, and that is what is illegal and void, and it is within the province of the Legislature to punish this illegality by forfeitures and penalties. Whilst the Constitution makes it competent to the Legislature, "by law," to forfeit the whole, or any part, of the money loaned, and, in addition, to impose a penalty, yet, until it does exercise this office, all that is "avoided" by the Constitution is the excess beyond the six per cent. Prior to the present Constitution, the legal rate of interest depended upon the legislative pleasure, to be changed whenever it seemed expedient. The framers of the Constitution thought it best to deprive the Legislature of this discretion, and therefore fixed the rate in the Constitution, but continued to the Legislature the power of determining the forfeitures and penalties.

By the act of 1704, ch. 69, sec. 1, it was provided, that no person or persons, whatsoever, should "exact or take, directly, for loan of any moneys," &c., at a higher than a certain rate specified in the section. This language is certainly as strong as that of the Constitution, and yet the Legislature that passed that act did not suppose that if a higher rate was exacted or taken, the contract was therefore avoided because of this declaration, and accordingly, therefore, went on, by the second section of the act, to make all such usurious contracts void,

and, by the third section, to provide forfeitures and penalties for the making of such contracts. The power exercised by the Legislature, in the passage of the second and third sections of the act of 1704, is the same as that which it is authorized to exercise by the 49th section of the 3rd article of the Constitution. If, as is the case, the Legislature has not provided, "by law," forfeitures and penalties, the courts cannot usurp the authority which the Constitution has, in express terms, empowered it to exercise. If the framers of the Constitution understood that the mere fixing in that instrument the legal rate of interest, *per se*, avoided the contract, they would not have confided to the Legislature the power to provide, by law, "forfeitures," for in that case there would be nothing to forfeit, and they would have simply directed the Legislature to provide a penalty. We must presume, that the convention which framed, and the people who adopted, the Constitution, understood what was the previous state of the law on the given subject, and that they were aware of the fact, that whatever may have been the view entertained in times gone by, in England and elsewhere, as to the sinfulness of taking *interest*, that here, in Maryland, both the Legislature and courts held it lawful and proper to do so to a certain rate, and beyond that as only *malum prohibitum*, and not as morally wrong in itself; that they considered it but little, if anything, short of immoral, for a person to avoid his solemn promise to refund what he had actually received of another's money. They could not have been uninformed of the existence of the act of 1845, ch. 352, which made it incumbent upon any one claiming to avail himself of the provisions of the act of 1704, specially to plead and set out, both principal and interest actually and fairly due, and that even when this should be done, the party so pleading was made liable for the principal and interest actually due; and if not ignorant of this, it is impossible to believe, they could have intended to repeal this act by indirection, when it was so easy to have done it in plain words. The very fact of not having done so, in such a manner, is conclusive evidence, to our minds, that they never intended to do so, but designed to leave that subject to the Legislature,

Bandel *vs.* Isaac.

And inasmuch as a repeal of a law is not to be unnecssarily inferred, and as the third section of the Bill of Rights continues in force "all acts of Assembly in force on the first Monday of November, eighteen hundred and fifty, except such as may have expired or may be altered by this Constitution," we conclude, (the Legislature not having done so,) that the act of 1845 is still in full force, subject "to the revision of, and amendment or repeal by, the Legislature of this State."

In construing a Constitution, we must take into consideration the circumstances which attended its adoption, and what appears to have been the understanding of those who endorsed it with their approbation, keeping always in view the proper office of a Constitution, which is, to declare general rules and principles, and to leave to the Legislature the duty of preserving or enforcing them by appropriate regulations, penalties, &c.; and, also, that the words in such an instrument ought to be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers, and by the people who adopted it. *State vs. Mace,* 5 *Md. Rep.,* 351. *Manly vs. The State,* 7 *Md. Rep.,* 147. *Groves vs. Slaughter,* 15 *Peters,* 449.

Now if the people of Maryland had been accustomed, and their courts had regarded the statutes on the subject of usury as importing a certain thing, whenever the same or equivalent words are employed in a subsequent Constitution or statute, the presumption of law is, that they are used in the same sense. *Duramus vs. Harrison & Whitman,* 26 *Ala.,* 326. *Ruckmaboye vs. Mottichund,* 32 *Eng. Law & Eq. Rep.,* 84. And, as was correctly said by Justice McLean, in *McLean, Assignee, vs. The Lafayette Bank, et al.,* 3 *McLean,* 613, if it be "admitted, that where a contract is made in violation of a statute, or of the policy of the law, it is void. And that a usurious contract in Ohio is not only against the statute, but in violation of the policy of the law. But the law seems to be well settled in this State, that usury constitutes an exception from the general principle; so that the contract is only void for the excess of interest. Other States have construed their laws against usury in the same way. Now, whether

this construction be right or wrong, is a matter of no import-
ance; it is the law;" so we say, that even were it conceded,
(although we deny it in fact,) that the general understanding,
in this State, of the meaning and office of the first section of
the act of 1704, was erroneous, yet it is the law, and in con-
struing our Constitution, we must construe it as a question of
intention in the adoption of it by the people, to be collected
from the whole scope of the provision itself, considered in
connection with the anterior and then existing laws on the
particular subject. 12 *Howard, S. C. Rep.*, 80. Here we
have a clause in our Constitution forbidding the demanding or
taking more than six per cent. as interest, with an authority
to the Legislature to provide, "*by law,*" in the way of for-
feitures and penalties, what shall be the punishment for de-
manding or taking more; and in such a case the rule is settled
by the case just cited from 12 *Howard,* that on a whole view
of the prohibition, and accompanying provision for regulations
in regard to the thing prohibited, that the contract is not avoid-
ed by virtue of the prohibition, but by the regulation which
expressly declares it to be so. This case, whilst it admits
some diversity in the decisions on the subject, is a sufficient
answer to most of the cases cited at the bar by the appellant's
counsel.

We might, if we deemed the occasion to require it, multiply
authorities to almost any extent in affirmation of the views we
have stated, but we think we have referred to a sufficient
number, and shall, therefore, content ourselves with a brief
recapitulation of the points of this decision.

1st. We hold, that the 49th section of the 3rd article of the
Constitution does not, *of itself,* make void, in whole, a con-
tract demanding or exacting more than six per cent. interest.
It merely fixes the legal rate of interest.

2nd. That it is for the Legislature, by forfeitures and penal-
ties, to make the contract void, either in whole or in part, as
to it may seem best, and by penalties, punish the party or
parties making such a contract.

3rd. That until the Legislature shall, "by law," provide
the necessary forfeitures and penalties, the act of 1845, ch.
352, remains in force.

Bandel vs. Isaac.

We hold the act of 1845, with the exception of its 5th & 6th sections, to be nothing more than an act relating to the *remedy*, that is to say, it prescribes the *mode* in which the party seeking to avoid any part of a contract, on the ground of usury, shall bring such defence to the notice of the court. Until he does bring such defence to the notice of the court, in legal contemplation, it has no existence.    If, however, it should be deemed expedient to adopt any other mode, it is for the Legislature to provide it.

From these it follows, that the judgment of the Court of Common Pleas must be affirmed, each and all the prayers offered by the defendant being in conflict with the view we have taken, and were, therefore, properly refused.    Until the Legislature shall otherwise order, an action may be maintained on a contract on which was demanded or taken more than six per cent. interest; and if the defendant desires to rid himself of liability for the excess beyond the six per cent., he must specially plead and set out what is actually and fairly due on the contract; unless he does so, he will be responsible to the extent of the face of his contract.

In further support of this opinion, we refer to the following cases:    *Groves, and other, vs. Slaughter*, 15 *Peters*, 449. *Bank of Chillicothe vs. Swayne, and others*, 8 *Ohio*, 280, 281. *Hynes vs. Cobb, et al.*, 2 *Louisiana Annual Rep.*, 363.    2 *Dallas*, 92.

*Judgment affirmed.*

( Decided March 16th, 1859.)

Note by the Reporter.—The following is the opinion of the Circuit Court of the United States, for the District of Maryland, in *Dill vs. Ellicott*, referred to in the above case, delivered by *Chief Justice Taney*, *Judge Giles*, who was his associate on the bench fully assenting.

"This action is brought by the endorser of a bill of exchange, drawn upon the defendants and accepted by them for $1000.    •

"The defendants plead that the bill was given to secure the payment of money loaned by the plaintiff to the payee of the bill, upon which an interest exceeding six per cent. was reserved, and that such contract was usurious, and the plaintiff not entitled to maintain an action upon it.    To this plea the plaintiff demurred, and the question submitted to the court on these pleadings, is whether, under the Constitution of Maryland, adopted in 1851, an action can be maintained upon a contract for the loan of money, where an interest of more than six per cent. is reserved or received

"The clause of the Constitution is in the following words:

" 'That the rate of interest in this State shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded, and the Legislature shall provide by law, all necessary forfeitures and penalties against usury.'

"This provision is contained in art. 3, sec. 49, under the head of 'Legislative Department,' and by the third article of the Declaration of Rights, all acts of Assembly in force on the first Monday in November 1850, which had not expired at the adoption of the Constitution, and were not altered by it, were continued in force, subject nevertheless to the revision of and amendment and repeal by the Legislature of the State.

"The acts of Assembly material to this question, which were passed previous to the adoption of the Constitution, were the acts of 1704 and 1845. The first section of the act of 1704, declared, that no person should exact or take above the rate of six per cent. per annum, upon the loan of any monies, goods or merchandise, or other commodities to be paid in money; the 2nd section declared, that all contracts by which a higher rate of interest was received should be void; and the third section inflicted penalties for taking or receiving more than the rate of interest limited by that act. The provisions of this law were materially changed by the act of 1845. By this act, the lender was entitled to recover the amount actually loaned with six per cent. interest upon it, although the contract was usurious and stipulated for a higher interest, and it repealed altogether the 3rd section of the act of 1704.

"The act of 1845, was still in force when the Constitution was adopted, and the point in issue between the parties, upon the demurrer, is, whether the provisions of this act are inconsistent with the clause of the Constitution before recited, and therefore repealed by it. In determining this question, the wisdom or policy of usury laws is not a subject for the consideration of the court. That was a question for the people of Maryland, when they adopted the Constitution; and it is the duty of the court to carry into effect the provisions of that instrument, according to its true intent, to be gathered from its own words, and referring to the previous legislation of the State, only so far as it may contribute to illustrate the meaning of doubtful or ambiguous language, if any such be found in the Constitution, and to ascertain what previous acts of Assembly are still in force. It would be difficult, we think, to raise a doubt as to the meaning of the prohibitory part of the section of which we are speaking. It declares, 'that the rate of interest shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded.' These words are free from all ambiguity. They prohibit in plain, positive and direct terms, the taking or demanding of more than six per cent. interest, and on this point it refers nothing to future legislation. The Constitution itself makes the prohibition, and all future legislation must be subordinate and conformable to this provision. And whoever takes or demands more than six per cent., while the Constitution is in force, does an unlawful act, an act forbidden by the Constitution of the State. Nor do the words which follow, qualify or restrain in any degree the meaning of the words above quoted. They declare that 'the Legislature shall provide by law all necessary forfeitures and penalties against usury.' Now usury consists in taking an interest for money above that allowed by law. The taking of more than six per cent. is therefore usury. And the words last quoted treat it as an offence, and directs the Legislature to punish it with penalties and forfeitures. The words do not merely give the power to punish, they are mandatory, and make it the duty of the Legislature to punish disobedience to that provision by forfeitures and penalties.

"Certainly, if the taking or demanding of more than six per cent., was not intended to be absolutely prohibited by the preceding part of the section, there would be no propriety in commanding it to be punished.

"The words last quoted, therefore, do not qualify or restrict the meaning of the preceding words. On the contrary, they show that the framers of the Constitution, after fixing the amount of interest which a party might

Bandel *vs.* Isaac.

lawfully take or demand, proceed to make that provision more effectual by requiring the Legislature to enforce it, and to inflict forfeitures and penalties upon any one who should thereafter take or demand an amount of interest exceeding that prescribed by the Constitution.

"This being the evident meaning of the language of this section, can a contract, by which a higher interest is taken or demanded, be enforced in a court of justice? It is true, the Constitution does not say in express terms that such a contract shall be void. Nor was such a provision necessary to invalidate it. For it is well settled by a multitude of decisions in this country and in England, that a contract to do an act forbidden by law is void, and cannot be enforced in a court of justice.

"We do not stop at present to refer to judicial decisions to support this proposition. Many cases to this effect, are quoted in the opinion delivered by the Supreme Court of the United States, in the case of the Bank of the United States against Owens, reported in 2nd Pet., 527, and we are not aware of any decision in any court in which a contrary doctrine has been held. Indeed, in a State where the legislative, Executive and Judicial departments are separated, it would render all law uncertain and ineffectual, if the judicial power enforced in whole or in part, the performance of a contract to do an act which is altogether forbidden to be done by the Constitution or laws of the State. And as the Constitution has forbidden the taking or demanding of more than six per cent., no contract made in this State can be enforced, when a higher rate of interest is taken or demanded by the contract.

"This view of the subject is fully supported by the decision of the Supreme Court, in the case of the *Bank of the United States vs. Owens,* hereinbefore referred to. The charter of the Bank contained a provision in the following words: 'It (the Bank) shall not be at liberty to purchase any public debt whatever, nor shall it take more than at the rate of six per cent. per annum, for or upon its loans or discounts.' And in an action brought by the Bank upon a promissory note, the defendant pleaded that it was discounted upon an agreement to pay the Bank a higher rate of interest than six per cent. To this plea the Bank demurred, thus bringing the question before the court, in the same mode of pleading adopted by the counsel in this case. And Mr. Sergeant, who argued the case for the Bank, contended, (as the counsel for the plaintiff have done here,) that a mere prohibition to take more than six per cent., did not avoid a contract to take more; and that where an agreement is avoided, it is always in consequence of an express provision by law to that effect, (*2nd Pet.,* 531.)

"But the court held otherwise, and the language of the Supreme Court, in deciding that question is so appropriate and directly applicable to the case before us, that we give it in the words of the court. They are as follows:

"'Some doubts have been thrown out whether, as the charter speaks only of *taking,* it can apply to a case in which the interest has been only reserved, not received. But on that point the majority of the court are clearly of opinion, that *reserving* must be implied in the word *taking,* since it cannot be permitted by law to stipulate for the reservation of that which it is not permitted to receive, 1 *Hawk. P. C.,* 620. In those instances in which courts are called upon to inflict a penalty upon the lender, whether in a civil or criminal form of action, it is necessarily otherwise, for then the actual receipt is generally necessary to consummate the offence. But when the restrictive policy of a law alone is in contemplation, we hold it to be an universal rule, that it is unlawful to contract to do that which it is unlawful to do.' And after deciding this point, and remarking briefly on the manner in which it came before the court, they proceed to say.

"'To understand the gist of the question it is necessary to observe, that although the act of incorporation forbids the taking of greater interest than six per cent., it does not declare void any contract reserving a greater sum than is permitted. Most, if not all, of the acts passed in England, and in the States, on the same subject, declare such contracts usurious and void.

" 'The question then is, whether such contracts are void in law upon general principles?

" ' The answer would seem to be plain and obvious, that no court of justice can in its nature be made the handmaid of iniquity. Courts are instituted to carry into effect the laws of a country. How can they then become auxiliary to the consummation of a violation of law? To enumerate here all the instances and cases in which this reasoning has been practically applied, would be to incur the imputation of vain parade.

" ' There can be no civil right where there is no legal remedy, and there can be no legal remedy for that which is itself illegal.'

" "We forbear to quote further from the language of the Supreme Court, and it is sufficient to say, that after having stated the principles of law in the manner set forth in the foregoing extract from the opinion, it proceeds to refer to many adjudged cases in support of the doctrine, showing that it applied to all cases where the act was prohibited by statute, although there was nothing morally wrong in the transaction; and upon this ground decided that the Bank could not maintain an action on the note, as the demurrer admitted, that it had been discounted upon an agreement to take more than six per cent. interest. We do not see how the case before us can be distinguished from the one decided by the Supreme Court. They present precisely the same question, and the established principles of law which decided the one in favor of the defendant, must decide the other in like manner.

"It will be observed also, that the opinion we have quoted points out clearly the distinction between a statute merely forbidding an act to be done, and one imposing a forfeiture or penalty for doing it, and is, in effect, an answer to that part of the argument on the part of the plaintiff, which relied on the last words of the section of the Constitution, requiring the Legislature to impose forfeitures and penalties against usury.

"The absence of any provision inflicting a penalty, (say the Supreme Court) does not give the party a right to maintain an action on the contract, if the law forbids the contract to be made. And the reason of the rule thus laid down is, that the contract being forbidden the party can acquire no legal rights under it, and consequently cannot maintain an action in a court of justice to enforce it. His incapacity to maintain an action upon it is no forfeiture or penalty, for he acquires no rights under it, and therefore there is nothing to forfeit. The money he loans is not forfeited, for if he chooses to rely upon the promise of the borrower, and the borrower repays him the money, he may lawfully keep it. It is not forfeited to the State or to any one else. But a court of justice cannot lend its aid to recover it, because the contract for the loan is one entire thing, and consequently is altogether valid or void, and it would be contrary to the duty of a court of justice, to assist a party in consummating an act which the law forbids. The absence of any penalty therefore is no argument in support of this action. But in this case there is something more than the absence of penalties and forfeitures. It is made the duty of the Legislature to inflict them, and the prohibitory clause of. the Constitution must be construed now, in the same manner and have the same effect as if the Legislature had performed the duty enjoined upon it. It is true, no penalty or forfeiture is incurred until the Legislature shall prescribe it. But when that duty shall have been performed, (be the penalty more or less,) no body, we presume, would contend, that an action could still be maintained on the contract upon payment of the penalty. And the act of no future legislation can alter the meaning of the words used in the Constitution. They remain the same, and must always be construed and administered in courts of justice according to their legal-import as they stand in that instrument. whether future Legislatures do or do not obey its mandates and pass laws to enforce its provisions. It follows from what we have said, that the first four sections of the act of 1845, are no longer in force. These sections made an usurious contract legal for the amount actually loaned, and authorises the lender to recover the amount with six per cent. interest. It makes it void only so far as the usurious interest is concerned, and as a necessary consequence of this provision, it repealed expressly the 3rd section of the act of 1704.

Bandel *vs.* Isaac.

"The act of 1845 does not therefore prohibit an usurious contract, but sanctions and supports it to the extent above mentioned. The Constitution, on the contrary, by the prohibiting words used in it, makes the whole contract illegal, and thereby incapacitates the party from maintaining a suit upon it, for the money he actually loaned, or any part of it; and moreover treats the taking or demanding more than six per cent. as an offence, and commands the Legislature to provide penalties and forfeitures against it. The provisions of this act of Assembly, and those contained in the Constitution, are consequently inconsistent with each other, and the former is repealed. In relation to the act of 1704, the plaintiff claims nothing under it. But inasmuch as the first section of that act, like the Constitution, prohibits the taking of more than six per cent., and the second section contains an express provision, making void the contract where more is taken, the plaintiff contends, that the omission of the second provision in the Constitution, proves that it was not intended to make void the contract, but to leave it as provided for and legalized by the act of 1845.

"But it is evident that the second section in the act of 1704, like similar provisions in the English statutes against usury, was introduced to remove any doubt which might be raised upon the words "exact or take;" and to show that the prohibition was intended to apply to contracts in which usurious interest was reserved to be paid at a future day, as well as to cases in which it was actually exacted and taken, or received at the time of the loan. They are introduced for greater caution and to prevent nice distinctions upon the words used. This is constantly done in acts of legislation, and the omission in the Constitution of a provision of this description, contained in a previous act of Assembly, would hardly justify the court in inferring, that it was intended to authorize an action on a contract which the Constitution itself prohibited. In expounding an instrument so solemn and deliberate as a Constitution containing the fundamental law of the State, we are hardly at liberty to suppose that either those who framed it, or those who adopted it, intended to recognize or sanction the principle, that an action might be maintained upon a contract to do an act which the law forbade. On the contrary, a comparison between the language of the act of 1704 and the Constitution, tends strongly to support the construction we have given to the latter. The prohibition in the act of Assembly, is to "exact or take," and the second section, as we have said, was introduced for greater caution, in order to show more clearly, that while the penalties by that law were confined to the actual receiving, the prohibition extended further, and embraced contracts in which · usurious interest was reserved, although payable at a future time.

"But the Constitution does not use the prohibitory words of the 1st section, but provides that no higher rate shall 'be taken or *demanded.*' Now these words clearly embrace a contract by which usurious interest is to be paid at a future day, as well as contracts in which it is taken and received. It does not mean usurious interest demanded in the negotiation previous to the loan, but demanded by the contract itself when actually made. And if so demanded it is evidently included in the constitutional prohibition, even although the words 'exacted and taken,' should be regarded as confined to actual receipt. In an instrument like this we are bound to presume, that every word was deliberately weighed and considered before it was inserted. And with the act of 1704 before them, and about to establish under a constitutional sanction the principle contained in its first section, it ought not to be supposed that its words were lightly or carelessly changed, or the word 'demanded,' substituted in place of the word 'exact,' without an object. And the natural and proper object would be to condense in a few words the substantial provisions spread out in the 1st and 2nd sections of the act of 1704. And we think they have used words sufficient to accomplish their purpose, and that the comparison between the words of this act of Assembly, and the Constitution of 1851, tends to confirm the construction we have placed upon the latter, and which its language naturally and legally imports.

"Upon the whole the court is of opinion that the demurrer of the plaintiff to the plea of usury cannot be maintained, and judgment must be entered accordingly."