MINNIE L. PERKINS AND LOUIS A. PERKINS
*v.* TIMOTHY H. ESKRIDGE

[No. 65, September Term, 1976.]

*Per Curiam Order September 24, 1976.*

*Opinion Filed December 1, 1976.*

Per Curiam Order

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge, and Orth, JJ.

*Marvin Ellin*, with whom were *Jonathan Schochor* and *Ellin & Baker* on the brief, for appellants.

*Amici Curiae* brief filed by Maryland State Bar Association, Inc. and The Bar Association of Baltimore City, *Jeffrey B. Smith* and *William W. Cahill, Jr.*, on the brief.

*E. Dale Adkins, III*, with whom were *John F. King* and *Anderson, Coe & King* on the brief, for appellee.

Digges, J., delivered the opinion of the Court.

Antonio's comment that "What's past is prologue," [1] certainly could be appropriately applied to the more than 170-year history of the statutory and constitutional aspects of a litigant's right to elect that his case be removed from one Maryland court to another. And within the past year, more so than during most other periods, there indeed has been much ado about that right as utilized by some parties in civil law actions. On September 18, 1975, this Court held that those portions of Article IV, section 8 of the Maryland Constitution applicable to the automatic removal of civil actions were unenforceable because they deprived Baltimore City litigants of the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution. *See Davidson v. Miller*, 276 Md. 54, 82, 344 A. 2d 422, 439 (1975).[2] We did rule, however, that trial

---

1. *W. Shakespeare, The Tempest* II, i, 261.

2. We were constrained to reach this result in *Davidson* because the Article IV, section 8 right to an automatic removal in civil actions, calling for transfer to any "other court having jurisdiction," construed in conjunction with the multiple civil court system existing in Baltimore City, countenances what amounted to a mere paper removal from one court to another within the City in satisfaction of the constitutional mandate, *see*

courts in this State retain their inherent judicial power to grant removals when it is necessary "to rid the case of any prejudicial barnacles which, because of local prejudice, passion or interest, may have attached." *Id.* at 83, 344 A. 2d at 439.

Within months of our *Davidson* decision, the legislature acted to reinstate the mandatory removal right by attempting to eliminate the constitutional defect which this Court determined in that case to exist. At its 1976 session, the General Assembly enacted legislation (effective July 1, 1976), now codified as Maryland Code, Courts and Judicial Proceedings Article (1974, 1976 Cum. Supp.), § 6-204, which grants all litigants in specified actions, upon application, an automatic removal to the court of another county.[3] Were this enactment constitutional, litigants in Baltimore City would have a right of removal, as a practical matter, equal

───

Middleton v. Morgan, 263 Md. 154, 158, 282 A. 2d 94, 96-97 (1971), whereas litigants filing suits in the 23 counties — in each of which there is only one law court of general jurisdiction — are guaranteed a transfer out of the county where the suit is filed. *See* Davidson v. Miller, 276 Md. 54, 64-68, 344 A. 2d 422, 429-31 (1975). Discerning no rational basis for this operational classification at the time of the *Davidson* decision, if indeed one had ever existed, this Court had no choice but to declare this provision of the Maryland Constitution to be in conflict with the United States Constitution. *See id.* at 79-82, 344 A. 2d at 437-38.

**3.** Section 6-204 provides in its entirety:

"(a) *Suggestion under oath.* — In actions at law, including issues from the orphans' court and appeals from the Workmen's Compensation Commission, pending in any of the courts of law of this State, upon suggestion in writing under oath of either of the parties to the action and not of counsel, that such party cannot have a fair and impartial trial in that county or judicial circuit in which the same may be pending, the court shall order and direct the record of proceedings in the action to be transmitted to a court of some other county within the circuit or to some other judicial circuit having jurisdiction in the action, for trial.

"(b) *Waiver.* — The right of removal is waived by a party unless the written suggestion is filed within 60 days after the action is at issue or after an issue from an orphans' court or appeal from a Workmen's Compensation Commission is filed, or within 60 days of the docketing of any action removed from another county or transferred from the District Court. Thereafter an action may be removed only by order of court for good cause shown.

"(c) *Action at issue on July 1, 1976.* — In any action at issue on July 1, 1976, either party has a right of removal for 60 days thereafter or until 5 days preceding the date of trial, whichever is less. (1976, ch. 454.)"

to the right under the Constitution prior to *Davidson* available to those in the 23 counties and the equal protection flaw of Article IV, section 8 would no longer prevent litigants from obtaining automatic removals. The life of this 1976 enactment was, however, quite short. By per curiam order filed on September 24, 1976, this Court concluded that, for reasons to be stated at a later date, this law's provisions violated those of Article IV, section 8 of the Maryland Constitution; we now state the reasons for that order.

The factual background of this appeal is uncomplicated, so much so that the relevant portions may be stated in a brief paragraph. Suit in this medical malpractice case was originally initiated by petitioners Minnie L. Perkins and her husband against Dr. Timothy H. Eskridge in the Baltimore City Court on March 31, 1975. Although respondent Eskridge did not seek a removal of the action during the next year under the inherent power of the court, shortly after § 6-204 became effective and within the time permitted by the act for the removal of cases instituted prior to its effective date, Dr. Eskridge on August 3, 1976, requested a removal to a jurisdiction outside Baltimore City. Acting pursuant to the new law, Judge Sodaro on August 31 transferred the action to the Circuit Court for Garrett County, and on the same day, denied the petitioners' motion to rescind the removal order. After this ruling against them, the petitioners filed yet another paper that day, this time a notice of appeal to the Court of Special Appeals.[4] Because of the importance of the question involved, we granted certiorari before that court considered the matter.

The resolution of the central issue in this case — the constitutionality of § 6-204 — involves an examination of this Court's decision in *Davidson*, particularly the effect of that ruling on the viability of Article IV, section 8 of the

---

4. Although the respondent moved to dismiss this appeal on the ground that it is interlocutory, we believe to the contrary that this case falls within our tenet that the alleged denial of a party's constitutional right of removal may be appealed immediately. *See, e.g.*, Smith v. Fredericktown Bank, 258 Md. 141, 142, 265 A. 2d 236, 237 (1970); Greenberg v. Dunn, 245 Md. 651, 653, 227 A. 2d 242, 243 (1967); State v. Cobourn, 169 Md. 110, 113, 179 A. 512, 513 (1935); McMillan v. State, 68 Md. 307, 308, 12 A. 8 (1888); Griffin v. Leslie, 20 Md. 15, 19 (1863).

Maryland Constitution with respect to any limitation it may place on legislative enactments. The petitioners primarily contend that the legislative change in the removal right was invalid because it was not accomplished by a constitutional amendment.[5] Conversely, the respondents argue that the legislature had the unfettered power to create a statutory right of removal since the effect of *Davidson* was to eliminate the civil removal provisions from Article IV, section 8, leaving only those provisions relating to criminal causes. Because as set out below, we determine that the impact of *Davidson* was not so severe as to amount to the excision of Article IV, section 8 from the Maryland Constitution as that section applies to civil actions (though perhaps our decision rendered the provision dormant for some purposes), we determine that the provision retains vitality sufficient to prohibit legislative enactments which conflict with it. Concluding, as we do, that § 6-204 directly contravenes the mandate expressed in Article IV, section 8, it follows that this enactment must yield to that higher authority. To understand why we reach these conclusions, it is necessary that we set out in some depth our analysis of (i) the origins of and rationale for the judicial review doctrine, (ii) the effect of a judicial determination that a statutory provision is unconstitutional, (iii) the consequence of a judicial determination that a state constitutional provision conflicts with the Federal Constitution, (iv) how the above principles relate specifically to the removal right, and (v) why § 6-204 conflicts with Article IV, section 8 of the Maryland Constitution.

(i)

Judicial review of constitutional issues is an inveterate tenet in the jurisprudential system of this State; nevertheless, it is important to our analysis of the effect of a decision holding a statute or constitutional provision to be in conflict with a higher authority that we examine very briefly the bases and scope of this Court's power in that

---

5. Although the petitioners attack the validity of § 6-204 on several other grounds, in view of the basis upon which we decide this case, we need not and specifically do not address their other contentions.

regard. Although at this nation's inception, there was some question whether the judiciary could declare acts of the legislature unconstitutional, *see G. Gunther, Cases and Materials on Constitutional Law* 16-25 (9th ed. 1975); Note, *The Theory of State Constitutions,* 1966 Utah L. Rev. 542, 560, even before *Marbury v. Madison,* 5 U. S. (1 Cranch) 137, 2 L. Ed. 60 (1803), established the doctrine of judicial review in the Supreme Court of the United States, numerous state and federal courts had already claimed and exercised this power. *See C. Antieau,* 2 *Modern Constitutional Law* § 15:7, at 606 (1969); *G. Gunther, supra* at 16-17; *C. Haines, The American Doctrine of Judicial Supremacy* 88-203 (2d rev. ed. 1932); Note, *supra,* 1966 Utah L. Rev. at 561. One of the cases pre-dating *Marbury v. Madison* was the decision penned by Chief Judge Chase for our predecessors in *Whittington v. Polk,* 1 H. & J. 236 (1802), wherein the following rationale for the doctrine of judicial review of legislation is set forth:

> "It is the office and province of the Court to decide all questions of law which are judicially brought before them, according to the established mode of proceeding, and to determine whether an Act of the Legislature, which assumes the appearance of a law, and is clothed with the garb of authority, is made pursuant to the power vested by the Constitution in the Legislature; for if it is not the result or emanation of authority derived from the Constitution, it is not law, and cannot influence the judgment of the Court in the decision of the question before them.
>
> "The oath of a Judge is 'that he will do equal right and justice according to the law of this State, in every case in which he shall act as Judge.' To do right and justice according to law, the Judge must determine what the law is, which necessarily involves in it the right of examining the Constitution, (which is the supreme or paramount law, and under which the Legislature derive the

626

only authority they are invested with, of making laws,) and considering whether the Act passed is made pursuant to the Constitution, and that trust and authority which is delegated thereby to the legislative body.

"The three great powers or departments of government are independent of each other, and the Legislature, as such, can claim no superiority or pre-eminence over the other two. The Legislature are the trustees of the people, and, as such, can only move within those lines which the Constitution has defined as the boundaries of their authority, and if they should incautiously, or unadvisedly transcend those limits, the Constitution has placed the judiciary as the barrier or safe-guard to resist the oppression, and redress the injuries which might accrue from such inadvertent, or unintentional infringements of the Constitution." *Id.* at 244-45.

Thus the teachings of *Whittington* established two fundamental concepts shortly after the birth of this State: A judge must say what the law is when questions are properly brought before the court, and since the Constitution is the supreme or paramount law, the court must determine upon challenge whether the legislature has exceeded its powers; and neither the judiciary nor the legislature is superior, one over the other — rather they are coordinate branches of government and the former must exercise its duty and authority to determine what the law is in order to ensure the viability of the separation of powers provision of the Maryland Constitution (Article 8 of the Declaration of Rights). Moreover, these principles have been continuously applied and reinforced in numerous cases since that time. *See, e.g., Dept. of Nat. Res. v. Linchester,* 274 Md. 211, 218-21, 334 A. 2d 514, 520-21 (1975); *Beauchamp v. Somerset County,* 256 Md. 541, 547-48, 261 A. 2d 461, 464 (1970); *Md. Committee v. Tawes,* 228 Md. 412, 425-26, 180 A. 2d 656, 663 (1962); *Painter v. Mattfeldt,* 119 Md. 466, 472-73, 87 A. 413, 416 (1913); *Baltimore v. State,* 15 Md. 376, 453 (1860);

*Thomas v. Owens*, 4 Md. 189, 225 (1853). *See generally* 1 *T. Cooley, Constitutional Limitations* 332-35 (8th ed. W. Carrington 1927); 1 *W. Willoughby, The Constitutional Law of the United States* 1-9 (2d ed. 1929).

(ii)

In light of this brief background with respect to judicial review, we now examine in greater depth what we consider to be a concomitant issue — the status of those statutes which have failed to withstand judicial scrutiny under the Constitution. Although we are more specifically concerned here with the status of a constitutional provision which conflicts with the Federal Constitution, we believe the principles developed in the area of statutory unconstitutionality are sufficiently analogous to be of assistance in our inquiry. Most attempts by commentators to summarize views on this subject have proved inadequate due to the variety of circumstances involved, the contradictory rulings in the area, and the changes in judicial policies and theories over the years. Carrington's 1927 edition of Judge Cooley's well-known and respected treatise, for example, states unequivocally the rule that a statute declared unconstitutional is void ab initio. *See* 1 *T. Cooley, supra* at 382-84. Another commentator of the same era, however, takes cognizance of the fact that this view fails to account for numerous decisions in conflict with the void ab initio doctrine, and declares the rule to be true in principle, but in need of qualification depending on varying circumstances. 1 *W. Willoughby, supra* at 11. More recent scholars have uniformly expressed the view that the void ab initio theory often is not applied because of the injustice or inconvenience which ensues when the theory is strictly followed. *See, e.g., G. Gunther, supra* at 34-36; *H. Rottschaefer, American Constitutional Law* 35-37 (1939); 1 *J. Sutherland, Statutes and Statutory Construction* § 2.07 (4th ed. C. Sands 1972). Although numerous law review articles expressing various views on the subject have appeared from time to time, *see, e.g.,* Bikle, *Judicial Determination of Questions of Fact Affecting the Constitutional Validity of*

*Legislative Action,* 38 Harv. L. Rev. 6 (1924); Crawford, *The Legislative Status of an Unconstitutional Statute,* 49 Mich. L. Rev. 645 (1951); Field, *Effect of an Unconstitutional Statute,* 1 Ind. L. J. 1 (1926); Sentell, *Unconstitutionality in Georgia: Problems of Nothing,* 8 Ga. L. Rev. 101 (1973); Note, *The Effect of the Unconstitutionality of a Statute,* 37 Geo. L. J. 574 (1949); 29 Colum. L. Rev. 1140 (1929); 40 Yale L. J. 1101 (1931), the only full-length work in the area is Professor Oliver Field's *The Effect of an Unconstitutional Statute* (1935). Even though this book is over 40 years old, it is not at this time a bit outdated (except perhaps for its table of cases) and remains the most analytical and comprehensive treatment of the subject. The author notes that courts generally have not applied any particular thesis as to the effect of an unconstitutional statute, but rather have utilized several rules at various times and in differing situations. *Id.* at 2-3. Field suggests that, moving from the broadest to the narrowest conceptualization of the impact of a court's declaration of a statute's unconstitutionality, these may be classified into three different theories: (1) The "void ab initio" theory, the traditional doctrine of American courts whereby the statute is given no effect and is treated as though it had never existed; (2) the "presumption of validity" theory, by which the act is attributed some effect in the past by allowing persons in good faith to presume a law is constitutional until a court declares otherwise, and (3) the "case-to-case" theory (attributing a less sweeping effect to judicial review), whereby the statute itself is neither wholly valid nor invalid, although a court may find that it conflicts with the constitution in a particular case. *Id.* at 3-8. We discuss these three theories in the order mentioned as a prelude to our analysis of Maryland cases on the effect of statutes failing to pass muster under the Constitution, as well as to provide background for our later consideration of the vitality of Maryland constitutional provisions in conflict with the Federal Constitution.

Although, as we will demonstrate later, the void ab initio approach has now been substantially diluted if not totally rejected by the United States Supreme Court as well as by

many state courts (including our own), during the early part of our nation's history it was not often questioned. The doctrine may have had its origins in the Blackstonian concept of that day that the judge was the discoverer of the law, not its creator, 1 *W. Blackstone, Commentaries* *70, and therefore a ruling that a statute was unconstitutional would relate back to the time of the act's passage and render it void, since presumably the "law" had always been that way and the court had only later discovered it. *See Linkletter v. Walker,* 381 U. S. 618, 623, 85 S. Ct. 1731, 1734, 14 L.Ed.2d 601 (1965). *See generally O. Field, supra* at 11; *see* Note, *The Effect of the Unconstitutionality of a Statute,* 37 Geo. L. J. 574, 576-78 (1949). Although this doctrine was expressed in the early cases of the Supreme Court, *see, e.g., Marbury v. Madison, supra,* 5 U. S. (1 Cranch) at 177, 2 L. Ed. at 73, its classic formulation appears in that Court's opinion, authored by Justice Field, in *Norton v. Shelby County,* 118 U. S. 425, 442, 6 S. Ct. 1121, 1125, 30 L. Ed. 178 (1886):

> "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *See Chicago, I. & L. Ry. v. Hackett,* 228 U. S. 559, 566, 33 S. Ct. 581, 584, 57 L. Ed. 966 (1913).[6]

Over the years since *Norton,* however, the Supreme Court has withdrawn from this generalization when necessary to reach what it considers a more equitable or practical result and today appears to have rejected the strict void ab initio view entirely. The *Norton* rationale was first explicitly questioned in *Chicot County Drainage Dist. v. Baxter State*

---

6. Even the Supreme Court itself, however, often failed to apply the rationale strictly in decisions contemporaneous with *Norton* when the Court deemed it expedient to utilize a different approach. *See, e.g.,* Central Pac. R.R. v. Nevada, 162 U. S. 512, 523-24, 16 S. Ct. 885, 887-88, 40 L. Ed. 1057 (1896) (state law in conflict with federal statute not void ab initio but merely unenforceable); Butler v. Goreley, 146 U. S. 303, 314, 13 S. Ct. 84, 88, 36 L. Ed. 981 (1892) (same); *In re* Rahrer, 140 U. S. 545, 564-65, 11 S. Ct. 865, 870, 35 L. Ed. 572 (1891) (same); *Ex parte* Medley, 134 U. S. 160, 174, 10 S. Ct. 384, 388, 33 L. Ed. 835 (1890) (state law, although ex post facto as applied, repeals predecessor statute).

*Bank,* 308 U. S. 371, 374, 60 S. Ct. 317, 318-19, 84 L. Ed. 329 (1940), where Chief Justice Hughes, writing for the Court, substantially narrowed its applicability:

> "[S]uch broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects, — with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." *See Linkletter v. Walker,* 381 U. S. 618, 622-27, 85 S. Ct. 1731, 1734-36, 14 L.Ed.2d 601 (1965).

Lately, by dictum in *Lemon v. Kurtzman,* 411 U. S. 192, 93 S. Ct. 1463, 36 L.Ed.2d 151 (1973), the Supreme Court to a considerable degree overruled the strict *Norton* approach. There, Chief Justice Burger said:

> "However appealing the logic of *Norton* may have been in the abstract, its abandonment reflected our recognition that statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. Appellants offer no persuasive reason for confining

the modern approach to those constitutional cases involving criminal procedure or municipal bonds, and we ourselves perceive none." *Id.* at 199, 93 S. Ct. at 1468; *see* Sentell, *Unconstitutionality in Georgia: Problems of Nothing,* 8 Ga. L. Rev. 101, 104 n. 19 (1973).

Paralleling these developments in the United States Supreme Court, most of our sister states have retreated from the *Norton* doctrine to some extent, *see e.g., Bookasta v. Hartford Accident & Indem. Co.,* 46 Cal. App. 3d 237, 241-42, 120 Cal. Rptr. 229, 231-32 (Dist. Ct. App. 1975); *Reich v. Board of Fire & Police Comm'rs,* 13 Ill.App.3d 1031, 301 N.E.2d 501, 504 (1973); *Roberson v. Penland,* 260 N. C. 502, 133 S.E.2d 206, 208 (1963), although at least one still applies it, *see, e.g., City of Atlanta v. Gower,* 216 Ga. 368, 116 S.E.2d 738, 742 (1960).

Another view regarding the effect of an unconstitutional statute — which Professor Field refers to as the "presumption of validity" theory — is that such an act should be deemed to have some effect in the past, but that it is invalid for all purposes in the future, that is, after the declaration of unconstitutionality. This rule seems to have developed as a response to situations where it would be unfair to apply the void ab initio view; the courts employing it have concluded that one should not incur personal liability when relying upon a statute reasonably believed to be valid. Under this view, for example, a police officer is not liable for damages for an arrest made pursuant to an unconstitutional statute, *see Yekhtikian v. Blessing,* 90 R. I. 287, 157 A. 2d 669, 671 (1960); *Bricker v. Sims,* 195 Tenn. 361, 259 S.W.2d 661, 664 (1953), board members are not liable for excess salary payments made under an invalid statute, *see Wade v. Board of Comm'rs,* 161 Okla. 245, 17 P. 2d 690, 692 (1932), and a marshal is not liable for an information filed pursuant to an invalid statute authorizing the seizure of liquor, *see Anheuser-Busch Brewing Ass'n v. Hammond,* 93 Iowa 520, 61 N. W. 1052, 1053 (1895). Other courts have utilized the rules of mistake of law and estoppel to avoid the strict void

ab initio view and have reached results indistinguishable from those formally deviating from *Norton. See O. Field, supra* at 4-5. In either case, it seems clear that the modern trend has been away from the doctrinaire void ab initio approach toward the more realistic views which have applied tests of reasonableness and good faith to determine the consequences flowing from conduct undertaken pursuant to an unconstitutional act. 1 *J. Sutherland, Statutes and Statutory Construction* § 2.07, at 23 (4th ed. C. Sands 1972).

The third basic view with regard to the effect of an unconstitutional statute, Field's "case-to-case" theory, takes cognizance of the fact that a judicial determination in a particular case does not render a statute wholly invalid; thus, pursuant to this principle, a statute constitutional under some circumstances may be unconstitutional under others, and constitutional as to some persons, yet unconstitutional as to others. As Field points out:

> "This is really a type of partial unconstitutionality, but it differs from the usual case of partial unconstitutionality in that the whole of the act, so far as its text and face are concerned, is valid, whereas in the true partial unconstitutionality case some definite portion of the text is held to be invalid; some phrase, sentence, or section is singled out and condemned.

> "The great advantage of this view of the effect of an unconstitutional statute is that it permits of great elasticity in the law. It lends itself to the administration of justice in a case-to-case system, with a proper tempering of justice to the individual case. The great disadvantage of this rule is that it does not lend itself to the formulation of rules of law. Prediction becomes well-nigh impossible. The stable element of the law almost disappears under this technique." *O. Field, supra* at 8 (footnote omitted).

The case of *Shepherd v. City of Wheeling*, 30 W. Va. 479, 4 S.

E. 635, 637-38 (1887), represents a classic statement of this approach:

> "When, in the course of determining the rights of the parties to a particular suit or controversy, the court finds it necessary to ascertain whether or not a statute is unconstitutional, the court must necessarily pass upon that question; but in doing so it does not annul or repeal the statute if it finds it in conflict with the constitution. It simply refuses to recognize it, and determines the rights of the parties just as if such statute had no existence. The court may give its reasons for ignoring or disregarding the statute, but the decision affects the parties only, and there is no judgment against the statute. The opinion or reasons of the court may operate as a precedent for the determination of other similar cases, but it does not strike the statute from the statute-book; it does not repeal, 'supersede, revoke, or annul' the statute. The parties to that suit are concluded by the judgment, but no one else is bound. A new litigant may bring a new suit, based upon the very same statute, and the former decision cannot be pleaded as an estoppel, but can be relied on only as a precedent.

> \* \* \*

> "In a very able opinion by Shaw, C. J., [in *Wellington v. Petitioners*, 16 Pick. 87, 96 (Mass. 1834)] which is approved and in part quoted in the text of Cooley, that eminent judge says: 'It may be well doubted whether a formal act of legislation can ever, with strict, legal propriety, be said to be void; it seems more consistent with the nature of the subject, and the principles applicable to analogous cases, to treat it as voidable. But whether or not a case can be imagined in which an act of the legislature can be deemed absolutely void, we think it quite clear that when such act is alleged to be void, on the ground that it exceeds the just limits of

legislative power, and thus injuriously affects the rights of others, it is to be deemed void only in respect to those particulars, and as against those persons whose rights are thus affected. *Prima facie*, and upon the face of the act itself, nothing will generally appear to show that the act is not valid; and it is only when some person attempts to resist its operation, and calls in the aid of the judicial power to pronounce it void as to him, his property, or his rights, that the objection of unconstitutionality can be presented and sustained.'" *See also Pierce v. Pierce*, 46 Ind. 86, 94-96 (1874); *Harlee v. Ward*, 15 Rich. 231, 239 (S.C. 1868).

The limited function of a court decree and the inherent weakness of the void ab initio rule were likewise pointed out by New Jersey's highest court early in this century:

"The vice of the doctrine of Norton v. Shelby County, as it seems to me, is that it fails to recognize the right of the citizen, which is to accept the law as it is written, and not to be required to determine its validity. The latter is no more the function of the citizen than is the making of the law. Each of these functions has been delegated by the Constitution, the one to the judicial and the other to the legislative branch of the government. And it is to be observed that the judicial function of determining the validity of statutes is confined within a very narrow scope. Courts are not vested with the general supervision of legislation. They have received no authority from the people to inspect each statute as it comes from the hands of the Legislature, and declare whether or not it infringes constitutional limitations. The function of the judicial department with respect to legislation deemed unconstitutional is not exercised in rem, but always in personam." *Lang v. Mayor*, 74 N.J.L. 455, 68 A. 90, 92 (Err. & App. 1907); *see Byrnes v.*

*Boulevard Comm'rs,* 16 N.J.Misc. 141, 197 A. 667, 670-71 (Cir. Ct. 1938), *aff'd,* 121 N.J.L. 497, 3 A. 2d 456 (Err. & App. 1939); *Attorney General v. McGuinness,* 78 N.J.L. 346, 75 A. 455, 462 (Err. & App. 1910); *Allison v. Corker,* 67 N.J.L. 596, 600, 52 A. 362, 363 (Err. & App. 1902).

Although none of the above three views has ever been explicitly embraced or rejected by this Court, over the years there has been a move away from the void ab initio doctrine towards the other two. It is true that our very early decisions such as *Whittington v. Polk, supra,* 1 H. & J. at 242, regarded unconstitutional acts as "mere nullities," but it is equally true that other, more recent decisions have deviated from a doctrinaire approach when necessary to meet the practicalities of a particular circumstance. In *Kimble v. Bender,* 173 Md. 608, 196 A. 409 (1938), for example, a statute providing for the appointment of justices of the peace was declared invalid. Rather than treat the actions of the appointees as "mere nullities," we utilized an approach analogous to the presumption of validity theory, since the law had been relied upon by the office holders as well as the public. *Id.* at 624-27, 196 A. at 416-17. Finding it necessary to meet that exigency, the Court reasoned:

> "The existence of the office of justice of the peace before the passage of the various acts mentioned takes the present case out of the line of cases represented by *Norton v. Shelby County, supra.* The unconstitutionality of these statutes of the Legislature of Maryland did not affect the office of justice of the peace under the Constitution, but were regulatory measures with respect to the number of justices, the exercise of their jurisdiction, and to their compensation.
>
> "The conditions are gratified for the operation of the rule that, under an invalid statute, providing for additional incumbents of the existing office under the Constitution, prescribing regulatory or

administrative details of the exercise of their jurisdiction as magistrates, and fixing their compensation, the additional incumbents of this office are officers *de facto* until the act is declared unconstitutional. On the facts here presented, public policy required obedience from the citizens of the provisions of these public statutes, even though unconstitutional, so long as the statutes have not had judicial condemnation. If individuals who deal with public officers may in every instance challenge their authority or deny their right to discharge the duties of the office, until the courts of final resort have given the sanction of their approval to the validity of the statutes under which these officers were elected or appointed, the conduct of public affairs will be involved in doubt and confusion so far as these offices are concerned." *Id.* at 626, 196 A. at 417.

Another case refusing to apply a strict *Norton* approach is *Home Utilities v. Revere*, 209 Md. 610, 617-19, 122 A. 2d 109, 112-13 (1956), in which our predecessors rejected the contention that the Maryland Fair Trade Act, concededly in violation of the Federal Sherman Act when passed, was void ab initio, ruling instead that

"[t]he better view seems to be that where a state statute is invalid because in conflict with Federal legislation, the state statute is in effect merely unenforceable or suspended by the existence of the Federal legislation and consequently the repeal of the Federal statute reinstates or revives the state law without an express reenactment by the State legislature." *Id.* at 619, 122 A. 2d at 113; *accord, Jawish v. Morlet*, 86 A. 2d 96, 97 (D.C. Mun. Ct. App. 1952); *General Electric Co. v. Packard Bamberger & Co.*, 14 N. J. 209, 102 A. 2d 18, 23 (1953); *Kinsey Distilling Sales Co. v. Foremost Liquor Stores, Inc.*, 15 Ill. 2d 182, 154 N.E.2d 290, 296 (1958).

Quite recently we have, in fact, explicitly noted the decline and fall of *Norton. See Slate v. Zitomer*, 275 Md. 534, 538 n. 2, 341 A. 2d 789, 792 (1975), *cert. denied*, 423 U. S. 1076, 96 S. Ct. 862, 47 L.Ed.2d 87 (1976). We now join, if we have not already implicitly done so, those courts which have refused to apply the void ab initio rule in all situations.[7]

### (iii)

The crucial matter we must consider, of course, is the extent to which a state constitutional provision has effect following a determination that it conflicts with the Federal Constitution. In many respects, the same practical approach described above is necessarily mandated; moreover, due to the exalted position of state constitutions, including our own, and because a provision of our Constitution (as distinguished from a statute) must be construed in relation to its limitations upon the General Assembly's legislative power as well as in relation to federal constitutional limitations upon its enforceability, we find that even more leeway is desirable here than in situations where we are dealing with the effect of unconstitutional statutes. When a provision of the Maryland Constitution violates the Federal Constitution, the State provision, depending on the circumstances of the case, may merely be unenforceable by parties seeking relief pursuant to it rather than totally excised so as to remove all restraints imposed by it. We find considerable support for this proposition by analogy to the more recent decisions regarding the residual effect of an unconstitutional statute, and as discussed below, the unique station occupied by constitutions, the principles of constitutional construction, and our prior decisions holding other provisions of the Maryland Constitution to be in conflict with the Federal Constitution.

7. We do not mean to imply, however, that we totally reject the *Norton* void ab initio rule. In some cases it may be appropriate to apply the rationale. *See, e.g.,* Barry Properties v. Fick Bros., 277 Md. 15, 38, 353 A. 2d 222, 235 (1976); State v. Ingel, 18 Md. App. 514, 522-23, 308 A. 2d 223, 229, *cert. denied,* 270 Md. 739, 742 (1973); *cf. Ex parte* Siebold, 100 U. S. 371, 376-77, 25 L. Ed. 717, 719 (1880). *See also* Johnson v. State, 271 Md. 189, 195, 315 A. 2d 524, 528 (1974).

638

The written constitution in this nation has always enjoyed a status superior to legislative enactments and has been variously portrayed as "original legislation," "organic law," or "fundamental law." *See, e.g., McCulloch v. Maryland,* 17 U. S. (4 Wheat.) 316, 415, 4 L. Ed. 579, 603 (1819); *Alexander v. State* ex rel. *Carver,* 274 Ala. 441, 150 So. 2d 204, 208 (1963); *Williams v. State,* 261 Ind. 547, 307 N.E.2d 457, 461 (1974); In re *Proposal C,* 384 Mich. 390, 185 N.W.2d 9, 14 (1971); *Dean v. Paolicelli,* 194 Va. 219, 72 S.E.2d 506, 510-11 (1952); Swindler, *State Constitutional Law: Some Representative Decisions,* 9 W. & M. L. Rev. 166, 167-68 (1967). *See generally* Note, *The Theory of State Constitutions,* 1966 Utah L. Rev. 542, 546. This Court has expressed similar sentiments:

> "A state constitution may aptly be likened to a legislative act enacted directly by the people themselves in their sovereign capacity as a political entity (that is, by the voters, for 'the original power of the people, in their aggregate political capacity, is delegated in the form of suffrage to such persons as they deem proper'), and therefore is the fundamental, extraordinary act by which the people establish the structure and mechanism. of their government. Essentially, a constitution is fundamental legislation directly by the people acting politically in their sovereign capacity, while a law is a rule of conduct prescribed by the legislative agents of the people under and subject to the delegated limitations of the previously ordained superior legislation, the Constitution." *Board v. Attorney General,* 246 Md. 417, 429, 229 A. 2d 388, 394 (1967) (citations omitted); *see Bandel v. Isaac,* 13 Md. 202, 223 (1859).

Thus the status of our Constitution as our "instrument of government," *see Co. Com'rs v. Supervisors of Elec.,* 192 Md. 196, 208, 63 A. 2d 735, 740 (1949), requires that it be preserved to the fullest extent possible when one of its provisions conflicts in some manner with the superior Federal Constitution.

We think the principles of constitutional construction are relevant because, of necessity, we are in essence required to construe what, if anything, remains of a provision of our Constitution following a determination that it conflicts with the Federal Constitution. Initially we observe that the same general rules apply as apply in the construction of statutes; however, because of the special status of the constitution, we, as do most courts, employ these rules more liberally and also utilize certain additional rules sui generis in constitutional cases. *See, e.g., County Council v. Supervisor,* 274 Md. 116, 120, 332 A. 2d 897, 899 (1975); 16 Am.Jur.2d *Constitutional Law* §§ 60-100 (1964); Swindler, *supra,* 9 W. & M. L. Rev. at 169-70. *See also Donaldson v. Harvey,* 3 H. & McH. 12, 19 (1790). We have no doubt, however, with regard to the primary objective confronting us: "In interpreting the Constitution the first thing to be got at is, what was the purpose of its framers?" *Johns Hopkins Univ. v. Williams,* 199 Md. 382, 387, 86 A. 2d 892, 894-95 (1952), *quoting Buckingham v. Davis,* 9 Md. 324, 328 (1856); *see Reed v. McKeldin,* 207 Md. 553, 561, 115 A. 2d 281, 285 (1955); *Beall v. State,* 131 Md. 669, 676, 103 A. 99, 102 (1917). The broad framework within which we analyze the purpose of the framers has been aptly stated and reiterated by our predecessors:

> "[W]hile the principles of the Constitution are unchangeable, in interpreting the language by which they are expressed it will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee. . . . In determining the true meaning of the language used, the courts may consider the mischief at which the provision was aimed, the remedy, the temper and spirit of the people at the time it was framed, the common usage well known to the people, and the history of the growth or evolution of the particular provision under consideration." *Norris v. Baltimore,* 172 Md. 667, 675, 676, 192 A. 531, 535 (1937),

*quoted in Johns Hopkins Univ. v. Williams, supra,* 199 Md. at 386, 86 A. 2d at 894 *and Boyer v. Thurston,* 247 Md. 279, 292, 231 A. 2d 50, 57 (1967).

It may also be noted that this Court will not give a narrow and technical construction to any provision of the Constitution where such literalism would defeat a purpose of the framers. *See, e.g., Co. Com'rs v. Supervisors of Elec., supra,* 192 Md. at 208, 63 A. 2d at 740; *Harman v. Harwood,* 58 Md. 1, 12 (1882). Although the more particular principles of constitutional construction have been expressed and have evolved through a number of this Court's decisions in addition to those referred to above, *see, e.g., Moberly v. Herboldsheimer,* 276 Md. 211, 217, 345 A. 2d 855, 858 (1975); *Johnson v. Duke,* 180 Md. 434, 442, 24 A. 2d 304, 307 (1942); *Catholic Cathedral v. Manning,* 72 Md. 116, 130, 19 A. 599, 603 (1890); *Smith v. Thursby,* 28 Md. 244, 260 (1868), one case succinctly states the import of our rules in this regard:

> "It is a cardinal rule of construction that where the text of a constitutional provision is not ambiguous, the Court, in construing it, is not at liberty to search for its meaning beyond the Constitution itself. If the text is ambiguous, the Court should first endeavor to ascertain its meaning from other parts of the instrument. It is not until the means of solution afforded by the entire Constitution have been exhausted without success that the Court is justified in calling outside facts or considerations to its aid. *When that becomes necessary, however, it is permissible to inquire into the prior state of the law, the previous and contemporary history of the people, the circumstances attending the adoption of the organic law, as well as broad considerations of expediency.* The object is to ascertain the reason which induced the framers to enact the provision in dispute and the purpose sought to be accomplished thereby, in order to construe the whole instrument in such way

as to effect that purpose. The Court may avail itself of any light that may be derived from such sources, but it is not bound to adopt it as the sole ground of its decision.

"Likewise it is permissible for the Court, in order to find the purpose of the Constitution, to consult the proceedings of the Constitutional Convention which framed the Constitution, or, in the case of a constitutional amendment, the proceedings of the Legislature which proposed the amendment. However, these also are not of binding force, but have persuasive value if they throw useful light upon the purpose sought to be accomplished or upon the meaning attached to the words employed." *Reed v. McKeldin*, 207 Md. 553, 560-61, 115 A. 2d 281, 285 (1955) (emphasis added) (citation omitted).

We find these analytical principles particularly appropriate because of the ambiguity inherent in most instances when a provision of the Maryland Constitution is found to contravene the Federal Constitution, in that it will generally be unclear from the words of the provision what the framers would have intended in such a case.

It is now appropriate that we review such previous decisions of this Court, which are few in number, as may render us aid in solving the problem we are confronted with here — the status of constitutional limits on legislative power following a determination that a provision of the Maryland Constitution violates the United States Constitution. In *Anderson v. Baker*, 23 Md. 531 (1865), the first time any provision of our State Constitution was attacked as violative of the Federal Constitution, *id.* at 615, the petitioner challenged as unconstitutional those portions of Article I of the 1864 Constitution which required him to take an oath in order to register to vote and subjected him to examination with regard to his qualifications and right to vote. Recognizing its duty to adjudge the provision in light of the Federal Constitution, this Court concluded that there was no violation of the United States Constitution, *id.* at

618-27, and thus had no occasion to consider the ramifications of a contrary holding. Nonetheless, in dictum, our predecessors noted that such a decision would "annul the organic law of the State." *Id.* at 629. Nearly 100 years later, the provision in the Maryland Declaration of Rights requiring an expression of belief in the existence of God as a qualification for State office was challenged as violating the First and Fourteenth Amendments to the Federal Constitution. *See Torcaso v. Watkins,* 223 Md. 49, 162 A. 2d 438 (1960), *rev'd,* 367 U. S. 488, 81 S. Ct. 1680, 6 L.Ed.2d 982 (1961). Finding no deprivation of Torcaso's federal constitutional rights, however, this Court concluded that Article 37 of the Declaration of Rights was not invalid, *id.* at 58, 162 A. 2d at 443-44, and consequently as in *Anderson v. Baker, supra,* had no reason to consider the impact of a different result. In *Schowgurow v. State,* 240 Md. 121, 213 A. 2d 475 (1965), decided shortly after the Supreme Court reversed our ruling in the *Torcaso* case, this Court was compelled to hold the provision of Article 36 of the Declaration of Rights mandating belief in God as a qualification for jury service violative of the First and Fourteenth Amendments to the United States Constitution. *Id.* at 131, 213 A. 2d at 482. In doing so, however, our predecessors made no mention of whether the legislature thereafter had the power to enact a statutory provision governing the subject.

The only case to our knowledge in which this Court explicitly considered the power of the legislature to enter a field previously regulated only by a state constitutional provision, after that provision was determined to be in conflict with the Federal Constitution, occurred in *Md. Committee v. Tawes,* 228 Md. 412, 180 A. 2d 656 (1962), with respect to this State's system of legislative apportionment in the aftermath of *Baker v. Carr,* 369 U. S. 186, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962). In an opinion filed on April 25, 1962, this Court expressed its views on the legislature's power to reapportion itself, where speaking through Judge Prescott we said:

"If the chancellor should find and accordingly

declare that Sections 2 and/or 5 of Article III of the Constitution of Maryland and all of the previous provisions of the original Constitution of 1867, and amendments thereto, relating to the apportionment of membership (and only to such apportionment) in the General Assembly, insofar as they apply to the General Election of November, 1962, violate the Equal Protection clause of the Fourteenth Amendment of the Constitution of the United States (and are, therefore, also inconsistent with Article 2 of the Declaration of Rights), it would declare that Sections 2 and/or 5 are null, void and of no effect in regard to said election. The court's declaration should make it clear, that the tenure and terms of the present members of the General Assembly are, in no way, affected by such declaration. They have been elected and have qualified as members of the General Assembly, and they are entitled to serve their full terms. Article III, Section 19, and Article XVII, Sections 1 and 3, Constitution of Maryland.

"The possibility that an adjudication of the invalidity of Section 2 or Section 5, or both, of Article III might create a total or partial legislative hiatus after the election of 1962, leads us to express some views with regard to procedures which might render action of an equity court going beyond mere declaratory relief unnecessary or inappropriate.

"There is no provision in the Constitution or election laws of this State that permits an 'at large' election of the members of the General Assembly, as suggested by the appellants. Article III, Section 6, of the Constitution provides that Delegates to the House shall be elected by the qualified voters of the counties, or legislative districts, which said Delegates represent.

"If the Court should declare that Sections 2 and/or 5 are invalid as to the November, 1962, election, it should also declare that the Leg-

islature has the power, if called into Special Session by the Governor and such action be deemed appropriate by it, to enact a bill reapportioning its membership for purposes of the November, 1962, election. With Sections 2 and/or 5 no longer a part of the Constitution with reference to said election, this necessarily follows, because the powers of the General Assembly of Maryland are plenary, except as limited by constitutional provisions. . . .

\* \* \*

"In the circumstances above assumed, namely, that Sections 2 and/or 5 are declared invalid, the decree might also declare that the General Assembly would be empowered to propose a constitutional amendment providing for reapportionment. This presumably would accomplish the same result proportionately between the different subdivisions of the State as that provided for in any reapportionment Act adopted for the 1962 election, and it might include provisions for future reapportionment designed to avoid a recurrence of the present problem. Since it has been traditional in this State to have the matter of representation in the General Assembly expressly regulated by the State Constitution, it might be thought desirable to draft any Act dealing with the 1962 election as a stop-gap measure, and to provide in any Constitutional Amendment that might be proposed a provision confirming and continuing in force the provisions of such an Act after the adoption of the proposed Constitutional Amendment and until the election to be held in 1966." *Md. Committee v. Tawes, supra,* 228 Md. at 437-39, 439-40, 180 A. 2d at 670, 671 (footnotes omitted).

In view of the exigence of that situation — where there was only a six-month period between our decision and the next election — this Court was forced to suggest a remedy which

would render Article III, sections 2 and 5 nugatory to a greater degree than that which would have been necessary had the circumstances been less compelling. We had little choice but to declare that the legislature would have the power, if called into special session, to enact a bill reapportioning its membership for purposes of the November 1962 election. This was so because we determined that Article III, section 6 of our Constitution prohibited the at-large election of members to the General Assembly, thus foreclosing the Court's use of that device as a temporary measure, and there was too little time for a new constitutional amendment reapportioning the legislature to be initiated and ratified prior to that election. On the other hand, we did suggest that the decree be framed as narrowly as it reasonably could be to preserve Article III, sections 2 and 5 to the greatest extent possible. We limited the ruling solely to the November 1962 election, noting specifically that the present tenure and terms of members of the General Assembly would in no way be affected; moreover, we strongly suggested that the legislature's power was to exist solely for stop-gap purposes and that a constitutional amendment should be utilized for future elections. *Md. Committee v. Tawes, supra,* 228 Md. at 439, 180 A. 2d at 671; *see Maryland Comm. for Fair Representation v. Tawes,* 377 U. S. 656, 675-76 & n. 23, 84 S. Ct. 1429, 1440, 12 L.Ed.2d 595 (1964).[8]

This brings us to *Davidson v. Miller,* 276 Md. 54, 344 A. 2d 422 (1975), the most recent case in which this Court has determined that a provision of our Constitution violated a federally guaranteed right. As discussed earlier in this opinion, see note 2 *supra,* we concluded in that case that the portion of Article IV, section 8 relating to the removal of civil law actions conflicted with the Equal Protection Clause

---

8. We note that in later related cases none of the parties litigated the power of the legislature to enact other than an emergency measure of limited duration, *see* Hughes v. Maryland Committee, 241 Md. 471, 483, 217 A. 2d 273, 279, *cert. denied,* 384 U. S. 950, 86 S. Ct. 1569, 16 L.Ed.2d 547 (1966); Maryland Committee v. Tawes, 229 Md. 406, 410, 184 A. 2d 715, 716 (1962), *rev'd,* 377 U. S. 656, 84 S. Ct. 1429, 12 L.Ed.2d 595 (1964), and as of 1970, apportionment once again became subject to constitutional rather than legislative control.

of the Fourteenth Amendment to the United States Constitution. *Id.* at 82, 344 A. 2d at 439. In doing so, we explicitly referred to the fact that our ruling merely rendered the provision "unenforceable so long as the present multiple civil common law court system exists in Baltimore City," and that the circuit courts' inherent power to guarantee fair trials was not curtailed. *Id.* at 82-83, 344 A. 2d at 439. We in no way intimated that Article IV, section 8 was rendered null and void. Quite to the contrary, as discussed in the next section, we granted relief so as to remove the flaw and yet preserve our organic law to the fullest extent possible, just as we did in *Md. Committee v. Tawes, supra.*

Based on this review of our prior decisions, as well as on the principles of constitutional construction and the other points mentioned earlier, we determine that several factors must be balanced whenever this Court is confronted with a provision of the Maryland Constitution which is in conflict with the United States Constitution. Foremost, since we are dealing with our organic law, we must bear in mind at all times the paramount concern of preserving as much of it as is reasonably possible when it must yield to higher constitutional authority. How much of the provision can be preserved will depend on the circumstances of each case, but two basic inquiries will always enter into our reasoning: first, is any intent manifested in the provision or elsewhere which is contrary to the rule that as much of the Constitution as is reasonably possible should be preserved, and second, are the conditions at the time of our decision such that the narrowest ruling, although desirable, is not practically possible. We now turn to the current status of the constitutional removal right and consider it in light of these observations.

(iv)

Although the right of removal in Maryland has indeed had a checkered history, the right has nonetheless been considered of such significance that it has been incorporated in some form into the organic law of this State continuously

for more than a century and a half.[9] By Chapter 55 of the Acts of 1804, the legislature proposed an amendment to the Constitution of 1776, to create the first written removal guarantee in civil and criminal cases.[10] Confirmed at the next session of the legislature by Chapter 16 of the Acts of 1805 and thus becoming a part of the Constitution, section 2 of that enactment allowed parties in any "suit or action at law" to remove a case, on an "affidavit, or other proper evidence," only within the judicial district [11] where the case originated. Sections 3 and 4 permitted, in criminal causes, both defendants and prosecutors to suggest a removal to an adjoining county, the decision being discretionary with the court. Finally, the 1805 amendment contained a proviso that the legislature could, from time to time, enact any "further remedy."

The Constitutional Convention of 1851 modified the removal right in several ways. It eliminated the court's discretionary power in criminal causes and granted defendants an absolute right in all such cases. Md. Const., Art. IV, § 28 (1851). In addition to "suits or actions at law," the right was enlarged to apply in cases "from the Orphans' Court, or from any court sitting in equity, [and] in petitions for freedom." While criminal removals could still be made to any adjoining county, civil actions could only be removed to an adjoining county within the judicial circuit (except for Baltimore City, where removals could be to an adjoining county). This unrestrained version of the right endured only 13 years. At the Constitutional Convention of 1864, numerous

---

**9.** A complete verbatim comparison of the removal provisions as they appear originally and by amendment in each Maryland Constitution from 1805 to the present may be found in *Constitutional Revision Study Documents of the Constitutional Convention Commission of Maryland* 209, 880-83 (1968); therefore, in the interest of brevity, we have quoted here only those provisions pertinent to the present case rather than appending the full text of each.

**10.** Prior to the adoption of this constitutional provision, courts possessed the inherent power to grant a change of venue to insure a fair trial. *See* Heslop v. State, 202 Md. 123, 126, 95 A. 2d 880, 881 (1953). This power exists independent of any statutory or constitutional provision and thus continues to be in effect at the present time. *See* Davidson v. Miller, *supra*, 276 Md. at 83, 344 A. 2d at 439.

**11.** The same act proposing the removal right also provided for a reorganization of the entire judiciary, one portion of which divided the state into six judicial districts, the forerunners of our present judicial circuits.

delegates assailed the unlimited right of removal on the grounds that its abuse had caused long delays, wastage of time and money, and great inconvenience to parties and witnesses alike, *see* 3 *Debates of the Constitutional Convention* 1403-06 (1864); accordingly, the automatic right was replaced with a discretionary one, in both civil and criminal cases, to be ordered only upon a satisfactory showing of prejudice. Md. Const., Art. IV, § 9 (1864). Also within the discretion of the court was the power to remove a case within the same or to any adjoining circuit. A further change in 1864 related to the legislature's power to enact remedies, the earlier proviso [12] being abandoned in favor of a clause which reads, as it has in each constitutional provision since that time: "[A]nd the General Assembly shall make such modifications of existing law as may be necessary to regulate and give force to this provision."

Only three years passed before the pendulum swung back, and a mandatory removal right was reinstated for both civil and criminal cases. Pursuant to the 1867 Constitution, the court had the power to remove the case to any other court having jurisdiction, but this was subject to the right of the moving party to insist that it be transferred to another circuit. Md. Const., Art. IV, § 8 (1867). Less than a decade later, however, further reports of abuse prompted a partial retreat from the 1867 unlimited privilege of removal. *See Heslop v. State*, 202 Md. 123, 129, 95 A. 2d 880, 882 (1953). By Chapter 364 of the Laws of 1874 the legislature proposed an amendment to the Constitution which, following its ratification in 1875, has now been operational for over 100 years. Though subject to the *Davidson* ruling, the organic law continues to provide that in civil actions and in criminal causes punishable by death, parties have a mandatory removal right; in non-capital criminal causes, the right is

---

12. In full, the clause in the Constitution of 1851 reads as follows:

"[S]uch further remedy in the premises may be provided by law, as the Legislature shall from time to time direct and enact." Art. IV, § 28.

With respect to the removal of civil law actions, the 1805 Amendment to the 1776 Constitution had a provision virtually identical to the one utilized in 1851.

dependent upon a showing of prejudice. Cases may now be removed to any court having jurisdiction in the matter, and the parties may no longer elect to have a case transferred to a different circuit.

Remaining cognizant of this brief history of the right, we now draw some conclusions with respect to the removal provision as it presently appears in our organic law. Although the main purpose of Article IV, section 8, as was equally true with respect to each of its predecessor provisions, is to assist litigants in obtaining a trial free from prejudicial influences, we have no doubt that a correlative aim for the past 171 years has been to keep the right directly under the control of the people and thus less subject to political influences. From the time in 1805 when the right was first codified in this State, it has always been expressed through a constitutional provision, even though the right could have been relegated to the status of a mere statutory grant initially, at the Constitutional Conventions of 1851, 1864 and 1867, or at any other time by constitutional amendment. Moreover, we detect a manifest intent over the years that legislative power with regard to the right be circumscribed. When this provision, as it has appeared in our various constitutions, has not guaranteed an automatic right (as, for example, in the 1864 provision applicable to all cases and in the current provision in non-capital criminal causes), the court, rather than the legislature, has been vested with the power to control the right through the exercise of its discretion. Additionally, we note the change in the language of the legislative enforcement provision as of 1864. Although the wording of the current clause obviously does not indicate an intent to eliminate the legislature's power in the area, it may well be that the change in wording, from the power to grant "such further remedy" to the power merely "to regulate and give force" to the provision, manifests an intent to narrow in some measure the General Assembly's power.[13] *See Heslop v. State, supra,* 202 Md. at

---

13. Even though an early case depicted the legislature's province as limited merely "to point[ing] out in detail how [the constitutional] provisions are to be carried into effect," State v. Dashiell, 6 H. & J. 268, 270 (1824), other cases construing the legislature's power to regulate the

132, 95 A. 2d at 884. Based on our review of the history of the right and our understanding of its purposes, we can perceive no basis for concluding that the people of Maryland would intend to relinquish their direct control over the removal right to the legislature, merely because enforcement of it, at this moment in time, violates the Federal Constitution. And this is particularly true since there is available another mechanism designed to provide litigants a fair and impartial forum.

We now examine the "broad considerations of expediency," *Reed v. McKeldin, supra*, 207 Md. at 561, 115 A. 2d at 285, surrounding this matter to determine whether — in spite of the fact that our rule of preserving as much of the organic law as possible could otherwise be effectuated merely by rendering Article IV, section 8 unenforceable as to litigants — we must anesthetize this provision to the extent that the legislature would no longer be subject to its proscriptions. Unlike the situation in *Md. Committee v. Tawes, supra* (where a statewide election was on the horizon, the potentiality of an interregnum was before us, and another provision of our Constitution proscribing at-large elections precluded the use of that remedy even temporarily, thus mandating the nullification of Article III to an extent sufficient to permit the legislature to act at least on an

---

removal area pursuant to the clause in the constitutional provision prior to 1864 consistently held that the General Assembly could enlarge the right, but could not validly enact any law which curtailed the right or conflicted with the Constitution. *See, e.g.,* Griffin v. Leslie, 20 Md. 15, 18 (1863); Wright v. Hamner, 5 Md. 370, 374-75 (1854); Negro Jerry v. Townshend, 2 Md. 274, 278 (1852). In the first case decided after the change of language in the legislative enforcement clause our predecessors made no comment on the difference, relying instead on *Dashiell* and *Griffin*, two pre-1864 cases, in noting that the legislature "may enlarge but cannot restrain the exercise of this right." Price v. Nesbitt, 29 Md. 263, 266 (1868). Cases decided subsequent to *Price* generally relied upon that decision's construction of the legislature's power, *see, e.g.,* Hoyer v. Colton, 43 Md. 421, 423 (1876), and it was not until our decision in Heslop v. State, 202 Md. 123, 132, 95 A. 2d 880, 884 (1953), that the change of 1864 was commented upon as possibly narrowing legislative discretion in the removal field. Since *Heslop*, however, there has been no explicit ruling on the matter and although some of our cases in dictum have continued to refer to the General Assembly's power to enlarge on the constitutional removal right, *see, e.g.,* Shreffler v. Morris, 262 Md. 161, 167, 277 A. 2d 62, 65 (1971); Bullock v. State, 230 Md. 280, 285, 186 A. 2d 888, 891 (1962), whether the legislature's power was narrowed as of 1864 remains an open issue.

interim basis), we face no momentous emergency and it is possible for us to keep all aspects of Article IV, section 8, operational except for the right of litigants to enforce it. There exists here, pursuant to the courts' inherent power to remove cases whenever necessary to insure fair and impartial trials, a mechanism parallel to that of the constitutional removal provision of Article IV, section 8. Moreover, the unenforceability of the civil removal provision itself is a condition subject to change since the most obvious barrier, the present multiple court system in Baltimore City, could be eliminated by unification at any time.

We hold, therefore, that although the effect of *Davidson* was to relegate Article IV, section 8 to a status whereby it is unenforceable by litigants in civil law actions, it did not have the effect of freeing the General Assembly from whatever limitations are imposed by that provision. We had no occasion there, as has been suggested, to render the provision "as inoperative as though it had never been adopted," *Firstman v. Atlantic Constr. & Supply*, 28 Md. App. 285, 298, 345 A. 2d 118, 126 (1975) or even "to excise" it, *Davidson v. Miller, supra*, 276 Md. at 87, 344 A. 2d at 441 (Murphy, C. J., concurring and dissenting). What we did in *Davidson* is analogous to what we do whenever it is necessary to separate the valid from invalid portions of a statute or of the Constitution when only one aspect of it conflicts with a higher authority. *See, e.g., Shell Oil Co. v. Supervisor*, 276 Md. 36, 48, 343 A. 2d 521, 528 (1975); *Cromwell v. Jackson*, 188 Md. 8, 28-29, 52 A. 2d 79, 89 (1947); *Baltimore v. O'Conor*, 147 Md. 639, 653, 128 A. 759, 764 (1925); *Somerset Co. v. Pocomoke Bridge Co.*, 109 Md. 1, 8, 71 A. 462, 465 (1908); *See also O. Field, supra* at 8.

(v)

Having determined that Article IV, section 8 is still a viable provision of the Maryland Constitution for the purpose of circumscribing legislative enactments relating to removal, we turn now to our final inquiry — the validity under that constitutional provision of § 6-204 of the Courts Article. It is well-established in this State that

the powers of the General Assembly are virtually unlimited, except for such restraints as are imposed by the Constitution. *See, e.g., Richards Furniture v. Board,* 233 Md. 249, 257, 196 A. 2d 621, 625 (1963); *Hennegan v. Geartner,* 186 Md. 551, 555, 47 A. 2d 393, 394 (1946); *Wyatt v. State Roads Comm.,* 175 Md. 258, 265, 1 A. 2d 619, 622 (1938); *Kenneweg v. Allegany County,* 102 Md. 119, 122-23, 62 A. 249, 250 (1905). Equally true are the propositions that every presumption favors the validity of a statute, that the Court will not declare an act unconstitutional because it is merely unwise or inexpedient, and that an act must plainly contravene a provision of the Constitution before it may be ruled invalid. *See, e.g., Magruder v. Hall of Rec'ds Comm.,* 221 Md. 1, 6, 155 A. 2d 899, 902 (1959); *Anne Arundel County v. English,* 182 Md. 514, 519, 35 A. 2d 135, 138 (1943); *Painter v. Mattfeldt,* 119 Md. 466, 472-74, 87 A. 413, 415-16 (1913); *Groff v. Frederick City,* 44 Md. 67, 78 (1876); *Harrison v. State,* 22 Md. 468, 491, 85 Am. Dec. 658, 666 (1864). In the construction of legislative enactments, moreover, we must attempt to harmonize the law with the Constitution, recognizing however that if a direct conflict exists between the law and the Constitution, the former must yield to the higher authority. *See Heslop v. State, supra,* 202 Md. at 131, 95 A. 2d at 883; *Griffin v. Leslie, supra,* 20 Md. at 19.

Cognizant of these general principles, we now set out the pertinent provisions of both the statute and the Constitution under consideration here. Whereas § 6-204 (a) provides for removals "to a court of some other county within the circuit or to some other judicial circuit," Article IV, section 8 permits transfers "to some other court" regardless of whether it is within the circuit. In light of the express conflict between the two, we discern no manner in which the law may be harmonized with the constitutional provision, and thus we have no choice but to declare § 6-204 invalid. Our decision in *Heslop v. State, supra,* is dispositive of the matter. In that case, a legislative enactment, Chapter 69 of the Laws of 1952, purported to grant an absolute right of removal to defendants in all criminal causes. Rejecting the argument that the law merely enlarged on the constitutional

right, Judge Delaplaine, speaking for the Court, concluded that the law was invalid because of the express conflict with the provisions of Article IV, section 8:

> "Since the Constitution, as it stands today under the Amendment, explicitly provides that in all criminal cases not punishable by death, the party applying for a removal must make it satisfactorily appear to the Court that such party cannot have a fair and impartial trial in that Court, or that there is reasonable ground for that suggestion, we hold that the Legislature cannot provide for absolute right of removal in cases punishable by imprisonment in the penitentiary, except by Constitutional Amendment. . . . Therefore, since Chapter 69 of the Laws of 1952 is not a Constitutional Amendment, we declare it invalid." 202 Md. at 132, 95 A. 2d at 884. *See also Weiskittle v. State,* 58 Md. 155, 158 (1882); *Griffin v. Leslie, supra,* 20 Md. at 19; *State v. Dashiell,* 6 H. & J. 268, 272 (1824).

In the present case, we are not concerned with a statute merely enlarging the constitutional right of removal (even assuming arguendo such a law may be valid), but one which was intended to contravene the provisions of Article IV, section 8, in an effort to provide all litigants the benefits of that provision's substantive right while avoiding the equal protection defect. Having discerned, however, that the *Davidson* decision did not impact on Article IV, section 8 in such a way as to obliterate its existence, we are left today with a constitutional provision which explicitly provides for removal to "some other court," and therefore the legislature cannot provide for removal to "some other county or judicial circuit," except by initiation of a new constitutional amendment. Since § 6-204 is not a constitutional amendment, we declare it invalid.